## COMMONWEALTH vs. WILLIAM BARNOSKI.

Middlesex. April 6, 1994. - August 3, 1994.

Present: LIACOS, C.J., ABRAMS, NOLAN, & LYNCH, JJ.

*Practice, Criminal*, Presence of defendant, Challenge to jurors, Voir dire, Cross-examination by prosecutor, Bill of particulars, Required finding, Assistance of counsel, Capital case. *Jury and Jurors. Constitutional Law*, Jury. *Evidence*, Cross-examination, Admission by silence, Consciousness of guilt. *Joint Enterprise. Homicide.*

The judge at a murder trial did not abuse his discretion in excusing a significant portion of the jury pool, for reasons of hardship, pursuant to G. L. c. 234A, § 40, outside the presence of the defendant and his counsel and without a stenographic record, prior to conducting individual substantive voir dire of the venire, where the purely administrative determination whether a prospective juror was able to serve without undue hardship for a month on a sequestered jury in a distant county was not a "critical stage" of the trial. [529-531]

A criminal defendant waived any argument with respect to the composition of the jury pool, the venire, or the jury by not objecting at trial; moreover, he demonstrated no prejudice. [532]

The record of a murder trial supported the prosecution's stated reason for his peremptory challenge of a certain juror, unrelated to the prospective juror's ethnicity, i.e., the juror's demeanor and comportment. [532-534]

At a murder trial, there was no substantial likelihood of a miscarriage of justice in the prosecutor's line of questioning of the defendant on cross-examination regarding the defendant's failure to call the police between the time of the shootings and his arrest, where the prosecutor simply brought out the fact that the defendant did not come forward when, if the defendant's story were true, it would have been natural to get help for his wounded friend. [534-537]

Evidence of a criminal defendant's conduct at the time of his arrest and thereafter in rubbing his right hand through his hair was properly admitted to establish why the test for gunshot residue particles might be negative, as it was. [537-538]

In a murder case, the defendant demonstrated no prejudice from the judge's allowing an amendment to the bill of particulars that changed the words "acting in a joint criminal enterprise" to "acting individually and or [in a] joint criminal enterprise," where defense counsel knew

long before trial that the Commonwealth's evidence was that the defendant was the one who shot the victims. [538-539]

At a murder trial in which the Commonwealth proceeded on the theory that the defendant was the one who shot the victims, error, if any, in the admission of certain evidence of the mental state of another tending to show a joint venture did not create a substantial likelihood of a miscarriage of justice. [539-540]

At the trial of an indictment for murder, there was ample evidence from which the jury could conclude that the defendant shot the victim. [540-541]

On appeal from a conviction of murder in the first degree the defendant did not demonstrate that his trial counsel had rendered ineffective assistance. [541]

No reason appeared on the record of a murder trial for this court to exercise its power under G. L. c. 278, § 33E, to order a new trial or reduce the verdict. [542]

INDICTMENTS found and returned in the Superior Court Department on July 8, 1988.

The cases were tried before *Robert A. Barton*, J., and a motion for a new trial was heard by him.

*Rosemary Curran Scapicchio* for the defendant.

*Marguerite T. Grant*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant, William Barnoski, was convicted by a jury of murder in the first degree, assault by means of a dangerous weapon, and armed assault with intent to murder. Both of the victims were shot; one victim, John R. McDermott (Jack), died from his wounds, the other, Jack's son, Peter McDermott (Peter), survived. In this appeal from the convictions and from denial of a motion for a new trial, the defendant argues that his convictions must be reversed. In addition, he urges us to act pursuant to our power under G. L. 278, § 33E (1992 ed.), to order a new trial or reduce the verdict of murder in the first degree. We affirm the convictions as well as the denial of the motion for a new trial. We conclude also that no relief under § 33E is warranted.

We begin with a recitation of the facts the jury would have been warranted in finding on the evidence admitted at

trial.[1] In May, 1988, Jack and his adult son, Peter, lived to-
gether at 26 Carroll Parkway in Lowell. Both McDermotts
knew, and occasionally socialized with, the defendant and his
wife, Donna Barnoski. On the night of the incident, May 9,
1988, at approximately 7:45 P.M., Peter arrived at Mac's
Two, a lounge in Billerica. He saw his father, the defendant,
and "Dukey" Kenney. Peter's father appeared to be upset.
Peter asked the defendant why Jack was upset, and the de-
fendant replied, "Peter, relax, your father will get his money
in three weeks." Peter drank two beers at Mac's Two, and
then left alone.

Sometime after 10:38 P.M. (Jack was stopped by a Chelms-
ford police office for speeding at that time), Jack went to a
Chinese food restaurant in Chelmsford. When he arrived, he
joined a group consisting of the defendant, the defendant's
wife, and two other men. The party ordered food and drinks.
Donna Barnoski paid the bill, and then she and the defend-
ant left. After fifteen to twenty minutes, the two men left;
Jack McDermott left approximately ten minutes later.

In the time after he left Mac's Two, Peter went to four or
five other bars. He had consumed as many as ten beers. At
approximately 11:50 P.M., Peter arrived at a sandwich shop in
Lowell. Peter telephoned his father to ask whether he wanted
anything to eat. Jack replied, "No, Billy's here." Peter or-
dered a sandwich and headed home.

He arrived at about 12:05 A.M., and found his father, the
defendant and his wife, "Dukey" Kenney, and Michael Mc-
Queeney in the living room. Peter greeted the group; his fa-
ther replied, "Hello." No one else spoke, except the defend-
ant, who looked up and said, "Yeah." Peter described the
situation as "tense."

Peter went into the kitchen, put his sandwich in the micro-
wave oven, and returned to the living room. Jack asked Peter
if he had any marihuana for their visitors; Peter told him

---

[1] As to the procedural facts arising in the posttrial motion for a new trial,
we take the facts as stated by the trial judge in his memorandum of
decision.

that he did not, but that he could obtain "the other stuff." Jack asked Peter to "get everyone a beer." Peter brought a six-pack of beer from the kitchen, and passed them out to the group. Then he sat down next to his father.

Jack said to the defendant: "Billy, the roads are bad. The cops are out there. Why don't you stay here for the evening; you're drunk." The defendant did not respond. The room remained quiet and tense. The defendant pulled a gun out of the waistband of his pants, and rubbed it between his hands. He walked across the room toward the McDermotts, the gun in his hands. McQueeney walked quickly to the defendant and took the gun. McQueeney pointed the gun at Peter McDermott's face and said, "Die motherfucker."

Jack addressed the defendant: "Billy, we can't have this. Please stop it." The defendant replied, "Relax, Jack, he's only a kid." The defendant took the gun from McQueeney, and McQueeney retreated. The defendant sat down next to his wife. He unloaded and reloaded the gun. Peter said to his father, "Fuck it, dad, we go, we go together." The defendant then stood up, took two steps toward the sofa where Peter and Jack sat, and with his arm "extended straight out shoulder high," shot Peter in the mouth. Peter turned toward the wall. Peter heard his father saying, "No, Billy, please don't. No. No." The defendant replied, "Relax, Jack, they're only blanks."

Peter felt severe pain in his mouth; his teeth began to fall out. Through the ringing in his ears, he heard a second shot. Then the defendant shot Peter again, this time in the neck. Peter fell to the floor. He heard another gun shot. Although he was conscious, he remained still on the floor, fearful that if he stirred, he would be shot again. He heard people run from the house.

Just as the defendant and the others were leaving the McDermott house, the McDermotts' next door neighbor, Michael Cawley, was arriving home. As he drove up to his house, Cawley saw Jack's and Peter's automobiles parked in front of their house. Flanking the entrance to Cawley's driveway were two other automobiles: a Lincoln Town Car and a

Mercury Cougar, neither of which had been there when Cawley had left about forty-five minutes earlier.

As Cawley maneuvered his vehicle into a parking spot on the street, he saw three people leave the McDermott house. He believed that there were two men and one woman. One of the men and the woman got into the Lincoln automobile. Another man, who was covering his face with his sweatshirt, got into the Mercury automobile. As Cawley walked from his vehicle to his house, he noticed that the couple in the Lincoln automobile was watching him. He also noticed that the McDermotts' front door was open. When he reached his door, the two automobiles sped away.

In the meantime, Peter got up from the floor, and spoke to his father, who was lying in a pool of blood. His father did not respond. Peter telephoned his mother. He said, "Dad and I have just been shot. Please help me." She responded, "Peter, you're drunk. Go to bed. It's late. Call me in the morning." She hung up; Peter then telephoned the Lowell police. An ambulance arrived and took him to Lowell General Hospital. On the way to the hospital, Peter was conscious and able to talk, but with difficulty. Peter asked if he was dying. After he was assured that he was not, he told the attendants in the ambulance that the defendant had shot him.

At the hospital, X-rays, a cursory examination and surgery revealed that one bullet had entered Peter's lower lip, shattered several teeth, shaved off the tip of his tongue, and gone through the roof of his mouth. The other bullet entered the left side of his neck below his ear, tore through a facial vein near his jugular vein, nicked his carotid artery, traveled through his right collarbone and lodged in the left side of his shoulder, where it remained. Peter McDermott survived.

Jack was not so fortunate. He died of two gunshot wounds to the head. An autopsy revealed that one bullet went through his right thumb, entered his face near the bridge of his nose, went through his teeth, tongue, and left neck muscles, and lodged in the left side of his back. Another bullet entered the back of his head, grazed his cerebellum, traveled through the floor of his skull, and lodged just behind his left

eye. Both shots were fired from close range and left a "stippling" pattern at the entrance wounds.

The police began surveillance of the defendant's house in Billerica shortly after 1 A.M. Parked outside the house were the defendant's Lincoln automobile and a Mercury Cougar automobile registered to McQueeney's girl friend. Just after 2 A.M., the Barnoskis left their house and headed out of Billerica in the Lincoln automobile. Police followed them for a distance, stopped them, and arrested them. The Barnoskis were taken to the Lowell police station.

· We turn to the issues raised in this appeal, which we shall supplement with additional facts when necessary.

1. *Jury selection.* The defendant raises a number of issues regarding the selection of the jury in this case. These issues were first presented in his motion for a new trial, which the trial judge denied. We address them in turn.

a. *The hardship excusals.* The defendant argues that his right to be present at all critical stages of his trial, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, see *Commonwealth* v. *Angiulo*, 415 Mass. 502, 530 (1993), was violated when the trial judge excused a significant portion of the jury pool, for reasons of hardship, outside the presence of the defendant and his counsel, and without a stenographic record.

We describe the empanelment process in this case.[2] As a result of the defendant's motion for a change of venue or, alternatively, to empanel the jury outside of Middlesex County, jury selection for the defendant's trial took place in Hampden County, over two days. On January 3, 1989, before the defendant was placed at the bar, the judge, with the permission of the Regional Administrative Justice for Hampden County, addressed the entire jury pool, consisting of 150-200 people, which had assembled in the Superior

---

[2]The defendant filed a petition with a single justice of this court pursuant to G. L. c. 211, § 3 (1992 ed.). The single justice denied relief, and his decision was affirmed in *Barnoski* v. *Commonwealth*, 413 Mass. 1007 (1992).

Court. There were numerous jury sessions which needed jurors that day. The judge welcomed the pool and informed the prospective jurors that he needed to empanel a jury for a case that would take approximately four weeks in Middlesex County and would require sequestration. The judge asked that any prospective juror who believed that sequestration for that length of time would pose an extreme hardship or inconvenience come forward to be heard. See G. L. c. 234A, §§ 35, 40 (1992 ed.). Approximately three-quarters of the pool were interviewed. The interviews were not under oath, and no record of the excuses was made. The judge excused a large number of those interviewed; their excuses ranged from family and financial obligations to paid travel plans. Thirty-four potential jurors remained after this preliminary inquiry.

Later that morning, the defendant was placed at the bar for trial. Defense counsel was informed of the fact that many members of the jury pool had been granted hardship excusals after a preliminary inquiry. After the judge had explained the procedure, defense counsel replied: "Okay. My only inquiry is this: If there are any jurors among these . . . who asked to be excused but you decided you did not want to excuse them, when we come to that individual juror I would like to just be apprised of that fact." When the judge informed defense counsel that he had made no notes, and thus could not be sure which potential jurors had come forward, defense counsel objected on the ground that this information was necessary for the meaningful exercise of the defendant's peremptory challenges.

After this exchange, the judge, in the presence of the defendant and his attorney, proceeded to describe, among other things, the nature of the case and the names of potential witnesses in preparation for the individual colloquies. Although the judge had previously granted excusals for hardship, a number of jurors were questioned about whether sequestration for such a lengthy trial would pose a problem.

The defendant makes two claims of error in regard to this procedure: it deprived him of his right to be present at all "critical stages" of his trial, see *Commonwealth* v. *Berg-*

*strom*, 402 Mass. 534, 543 (1988); and it prevented him from exercising his peremptory challenges knowledgeably.

A trial judge is allowed a broad range of discretion in the jury selection process. *Commonwealth* v. *Amazeen*, 375 Mass. 73, 83 (1978). *Commonwealth* v. *McKay*, 363 Mass. 220, 223 (1973). General Laws c. 234A, § 40 (1992 ed.),[3] provides: "In the event a trial is expected by the court to last more than three trial days, the trial judge shall announce this fact to jurors before the jury is impanelled. The trial judge may excuse a juror from performing his juror service on such an extended trial upon a finding of hardship, inconvenience, or public necessity . . . ." The judge recognized that this case presented unusual circumstances for prospective jurors, and anticipated (correctly) that a large percentage of the pool would seek hardship excusals. We conclude that the judge did not abuse his discretion when he conducted the interviews prior to bringing the defendant to the bar.

We are aware of no case that holds a defendant has a constitutional right to be present at preliminary hardship colloquies of members of the jury pool, nor have the parties provided us with any authority precisely on point. Indeed, *Commonwealth* v. *McKay*, *supra*, and *Commonwealth* v. *French*, 357 Mass. 356, 400 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972), hold the contrary. All of the cases that the defendant cites to support his view that he does have such a right are inapposite, because they concern different, and later, stages of prosecution. For example, in *Commonwealth* v. *Robichaud*, 358 Mass. 300 (1970), this court reversed a conviction where the defendant had been excluded from a voir dire of *sitting* jurors regarding alleged misconduct by another juror. *Id.* at 302. We noted that "[c]ourts have . . . uniformly held that the defendant has a right to be present when jurors are being examined as to their *qualifications*

---

[3]See also G. L. c. 234, § 1A (1992 ed.), which authorizes a judge to excuse from jury service any person for whom such service will "impose undue hardship or unusual inconvenience."

. . ." (emphasis supplied). *Id.* Likewise, in *Commonwealth v. Owens,* 414 Mass. 595 (1993), we held that it was error for the judge to deny the defendant's request that he be present during the individual voir dire of prospective jurors. *Id.* at 602. "A defendant has a right to be present when jurors are being examined in order to aid his counsel in the selection of jurors and in the exercise of his peremptory challenges." *Id.,* citing *Lewis* v. *United States,* 146 U.S. 370, 373 (1892). See *Commonwealth* v. *Angiulo, supra* (error to conduct voir dire about potential prejudice of jurors outside defendant's presence). Nothing in any of those cases suggests that a defendant has the right to be present when a judge conducts hardship colloquies of the jury pool prior to the individual, substantive, voir dire.

Moreover, the defendant's ability to exercise his peremptory challenges was not compromised. The defendant was present during the colloquies regarding potential jurors' qualifications; he was able to observe their demeanor, hear their responses to a variety of questions and evaluate their fitness to serve on the jury. The purely administrative determination whether a prospective juror was able to serve without undue hardship, for nearly one month, on a sequestered jury in a distant county, was not a "critical stage." While the defendant may be correct when he states that additional, useful information could have been gleaned from observing the hardship colloquies, this does not mean that he could not meaningfully exercise his challenges. See *Commonwealth* v. *Allen,* 379 Mass. 564, 577 (1980). There was no error.[4]

---

[4]The defendant's argument that the judge violated Superior Court Rule 5 (1994) is without merit. That rule provides: "When practicable, excuses of jurors shall be presented under oath to the presiding justice . . . . If any juror is excused in any place other than in open court, the justice excusing him shall forthwith notify the clerk of his action and the ground thereof." The judge notified the clerk which jurors had been granted hardship excusals; the rule requires nothing more. The judge did not abuse his discretion in not requiring the prospective jurors to be under oath. Moreover, defense counsel did not object to the judge's failure to give detailed explanations of the excusals sought, and thus, any argument is waived. Defense counsel's *only* objection to the hardship excusals related to his request that the judge inform him which jurors had sought, but had been denied, such

b. *Fair cross section of the community.* The defendant argues that he was denied his right to a jury composed of a fair cross section of the community, see *Commonwealth* v. *Soares,* 377 Mass. 461, 478, cert. denied, 444 U.S. 881 (1979), because the judge allegedly exhibited gender bias during the hardship colloquies. The defendant assumes that the judge exhibited gender bias during these colloquies because, during the voir dire, the judge asked more women about child care responsibilities than men.

The defendant's argument fails for a variety of reasons. First, defense counsel never objected to the composition of the pool, the venire, or the jury, and thus, waived any argument. "[C]hallenges to the composition of a . . . jury must be raised only by a pretrial motion to dismiss the indictment or the venire." *Commonwealth* v. *Pope,* 392 Mass. 493, 498 (1984). Moreover, even if the defendant could show that the judge treated male and female prospective jurors differently (unlike the defendant, we see no reason to believe such a showing is probable), the defendant suffered no prejudice, because there were a majority of women on the venire, the trial jury, and the deliberating jury. See *Commonwealth* v. *Owens, supra* at 605 (failure to object to defendant's exclusion from sidebar voir dire constitutes waiver; no prejudice shown); *Commonwealth* v. *Hamilton,* 411 Mass. 313, 318 (1991) (absent a proper objection to procedural defect, prejudice must be shown). See also G. L. c. 234A, § 74 (1992 ed.) (same).

c. *Alleged violation of Commonwealth v. Soares.* The defendant argues that the Commonwealth's use of one of its peremptory challenges on an Hispanic prospective juror violated the principles of *Commonwealth* v. *Soares, supra.* We disagree.[5]

---

excusals. If the defendant had objected on the ground he now argues, the judge might well have supplemented the record with additional information.

[5]The defendant also argues that African-American and Hispanic prospective jurors were underrepresented. No timely objection was made to the racial or ethic composition of the venire, and thus, no clear record of

After the prosecutor announced that he was challenging the prospective juror, the judge immediately asked defense counsel if he was "raising *Soares*." Defense counsel replied that he was, and the judge asked the prosecutor to articulate his reason for the challenge. See *Commonwealth* v. *Harris*, 409 Mass. 461, 468 (1991). The prosecutor responded that his challenge was based on the prospective juror's "demeanor when he was on the individual voir dire, as well as the clothing that he's worn into court." During individual voir dire, the prospective juror had revealed that he listed his one year old daughter as his "spouse" on the juror questionnaire. In addition, the following exchange occurred:

THE JUDGE: "Is there any reason why you do not stand indifferent on this case?"

THE PROSPECTIVE JUROR: "I don't stand indifferent."

THE JUDGE: "Well, we want you to stand indifferent. Is there any reason why you don't stand indifferent?"

THE PROSPECTIVE JUROR: "No, I'm not prejudiced or nothing."

. . .

THE JUDGE: "The Court finds this juror to be indifferent. . . . Do you want to say something?"

THE PROSPECTIVE JUROR: "Everybody is laughing at me."

THE JUDGE: "Who's laughing at you?"

THE PROSPECTIVE JUROR: "No, just 'cause my answer. I said I'm indifferent."

---

the race and ethnicity of prospective jurors exists. The defendant's calculations (which purport to show underrepresentation of those groups) appear to be based on an assumption that the only African-American and Hispanic members of the venire were two prospective jurors whose ethnicity, after they had been challenged, was noted by the judge. There is no basis for such an assumption. In any case, the defendant's failure to move to strike the venire precludes this argument on appeal. See *Commonwealth* v. *Pope*, 392 Mass. 493, 498 (1984). We note also that the courts have concluded that persons of Hispanic origin are not a separate "race" within the meaning of G. L. c. 234, § 28 (1992 ed.). See *Commonwealth* v. *De La Cruz*, 405 Mass. 269, 272-273 (1989). Cf. *id.* at 276-277 (Liacos, C.J., concurring) (arguing for a broader interpretation of § 28).

Although the transcript cannot reflect the actual demeanor of the prospective juror, this excerpt goes some way toward indicating that the prospective juror comported himself in a manner which the prosecutor could find troubling for reasons unrelated to the prospective juror's ethnicity. We credit the judge's acceptance of the prosecutor's reason for exercising a peremptory challenge. There was no error.

2. *Cross-examination of the defendant.* The defendant argues that he is entitled to a new trial because, in cross-examining the defendant, the Commonwealth improperly and prejudicially inquired into the defendant's failure to report the crime prior to his arrest. Defense counsel did not object to the questions at issue, and our review is therefore limited to a determination whether there is a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). We conclude that there is no such likelihood.

On direct examination, the defendant testified that he had seen Peter shoot Jack twice in the head. He testified that, after shooting his father, Peter threatened the defendant's wife with the revolver, and that, while the defendant was crouched over his wife on the floor to protect her, Michael McQueeney struggled with Peter over the gun; further, that during the struggle, Peter was shot twice. The defendant also explained that he was nervous and worried, because he knew that leaving in a panic was "the wrong thing to do."

On cross-examination, the prosecutor asked the defendant if he tried to take the gun away from Peter, or if he telephoned an ambulance or the police. He asked if the defendant rode past the Billerica police station on his way home, and whether he had gone in to report the shootings. He asked whether the defendant had stopped at a pay telephone to call the police, an ambulance, or someone in the McDermott family. The defendant acknowledged that, in the hour and forty-five minutes between the shootings and his arrest, he took no steps to help his friend Jack.[6]

---

[6]We quote portions of the testimony:

The defendant argues that these questions were improper, and constituted an improper use of his prearrest silence. For

---

THE PROSECUTOR: "And you ushered your wife out [of the McDermott house]?"

THE DEFENDANT: "In the process of ushering."

THE PROSECUTOR: "And your friend's on the floor having been shot?"

THE DEFENDANT: "Yes, sir."

THE PROSECUTOR: "Do you go for the gun?"

THE DEFENDANT: "No, sir."

THE PROSECUTOR: "Do you take the phone away and call anyone?"

THE DEFENDANT: "No, I didn't."

THE PROSECUTOR: "Did you call the ambulance from the McDermott home?"

THE DEFENDANT: "No, I did not."

THE PROSECUTOR: "Did you call the police?"

THE DEFENDANT: "No, I did not."

THE PROSECUTOR: "Did you call anyone?"

THE DEFENDANT: "No, sir, I did not."

The cross-examination continued:

THE PROSECUTOR: "So you're concerned and you're worried and you're nervous, is that correct?"

THE DEFENDANT: "That is definitely correct."

THE PROSECUTOR: "You know where the Billerica police station is, don't you?"

THE DEFENDANT: "I certainly do."

. . .

THE PROSECUTOR: "Did you go past it that night?"

THE DEFENDANT: "I don't recall which direction my — which route my wife took."

THE PROSECUTOR: "You certainly didn't go in it, did you?"

THE DEFENDANT: "I certainly did not."

THE PROSECUTOR: "You didn't report: I just witnessed a shooting."

THE DEFENDANT: "No, I did not."

THE PROSECUTOR: "I just witnessed a struggle?"

THE DEFENDANT: "No, sir."

THE PROSECUTOR: "People may be injured?"

THE DEFENDANT: "No, I didn't."

. . .

THE PROSECUTOR: "[D]id you stop anywhere to use a public telephone?"

THE DEFENDANT: "No, sir, I did not."

THE DEFENDANT: "To call anyone?"

THE DEFENDANT: "No, I didn't."

The prosecutor also asked whether, once the defendant arrived home, he telephoned the police, an ambulance, or a member of Jack's family. He asked whether the defendant's wife, in his presence telephoned the police, an ambulance, or Jack's daughter. The defendant answered no to each of

this proposition, he relies on *Commonwealth* v. *Nickerson*, 386 Mass. 54 (1982). In that case, we held that the trial judge had committed reversible error in instructing the jury that the defendant's veracity could be doubted if they found that he had not come forward to disclose that he was at the scene of the crime, that he witnessed an attack, that he saw a weapon there, and that he knew the identity of the attacker. *Id.* at 60. We held that "[t]o permit the use of his pre-arrest silence, if only for impeachment purposes, suggests that the defendant had a duty to provide incriminating evidence against himself and burdens his right to testify in his own defense." *Id.* at 61, citing *Jenkins* v. *Anderson*, 447 U.S. 231, 246 (1980) (Marshall, J., dissenting).

Although the defendant seems to argue that the entire line of cross-examination regarding his failure to report the crime or seek help was improperly allowed, *Nickerson* states otherwise: "Of course, a defendant's failure to report certain facts to someone other than the police would be an appropriate subject for cross-examination where it would have been natural for the defendant to report those facts." *Nickerson, supra* at 62 n.6. Clearly the questions regarding the defendant's failure to summon an ambulance or call someone in the victim's family fit that description. We therefore limit our consideration to the questions regarding the defendant's failure to call the police in the time between the shootings and his arrest.

We think these questions, given that they came in a series of questions about how serious Jack's injuries were and whether the defendant called an ambulance (or anyone) to report that his friend Jack was lying bleeding in his house, were understood by the jury to imply that, if the defendant's story were true, he naturally would have contacted the police to get help for his wounded friend, not to tell them his exculpatory story. The prosecutor did not ask any questions about

---

these questions. The prosecutor then asked: "Your friend's sitting on the floor in Lowell and you're sitting at your kitchen table, is that right? The defendant replied, "That's — that's — that's right, sir."

the defendant's failure to inculpate Peter (and thus exculpate himself). He simply brought out the fact that the defendant did not come forward when it would have been natural for him to do so.[7]

In contrast, the judge in the *Nickerson* case specifically directed the jury's attention to the defendant's prearrest failure to name the assailant to the police, *id.* at 61,[8] and the information itself tended to incriminate the defendant, *id.* at 62. The risks we identified in that case simply were not present here. There was no error, let alone a substantial likelihood of a miscarriage of justice.

3. *Evidence of the defendant's rubbing his hand through his hair.* Chemist Robert A. Sullivan testified that, at the time the defendant was arrested, and just before the defendant's hands were to be swabbed for gunshot residue, the defendant rubbed his right hand through his hair repeatedly. Sullivan also testified that this act could have had an adverse effect on the test because gunshot residue particles "are loosely held and easily removed." Defense counsel did not object to the testimony about the defendant rubbing his hand through his hair, but he did object to questions regarding the possible adverse effect that doing so could have on the test results, although he did not state the ground for the objection. The defendant now claims that admission of this testimony was reversible error. We disagree.

Both the defendant and the Commonwealth frame their arguments about this testimony in terms of the defendant's consciousness of guilt. The defendant claims that this evi-

---

[7]In addition, the prosecutor did not make specific reference to the defendant's failure to contact the police in his closing argument, thereby further minimizing any risk of prejudice.

[8]Indeed, the judge's misinstruction formed the basis for our reversal. *Commonwealth* v. *Nickerson*, 386 Mass. 54, 60 (1982). In this case, there was no such instruction. The judge did give, as he was required to do, the standard instruction on consciousness of guilt. *Commonwealth* v. *Toney*, 385 Mass. 575, 586 & nn. 4-6 (1982). See *Commonwealth* v. *Cruz*, 416 Mass. 27, 29 (1993). There was ample evidence, other than the defendant's failure to go to the police, of the defendant's flight and concealment to justify this instruction.

dence was not probative of his consciousness of guilt, because no evidence had established that the defendant knew the purpose of the test or the possible effect that rubbing his hand through his hair might have. We tend to agree,[9] but need not decide the issue because the testimony, in our view, had a purpose other than showing consciousness of guilt. The testimony simply tended to show why the test for gunshot residue might be negative, as it turned out to be. There were numerous reasons why the defendant might put his hand through his hair; the prosecutor did not attempt to elicit testimony tending to show a "guilty" purpose — he merely established that the defendant's act may have affected the test result. There was no error in allowing the testimony.[10]

4. *The amendment to the bill of particulars.* The bill of particulars originally filed by the Commonwealth in this case set forth, in graphic detail, a joint venture theory wherein the defendant was the principal actor.[11] At the close of all the

---

[9]Although we need not decide whether the evidence could be used as showing the defendant's consciousness of guilt, we note that the Commonwealth's reading of *Commonwealth* v. *Toney*, 385 Mass. 575 (1982), is overly broad. In that case, we held that the Commonwealth did not have to prove that the defendant knew she was being sought by the police for evidence of flight to be admissible. *Id.* at 583. "Evidence that a person flees from the scene of a crime or from his usual environs may be probative of a consciousness of guilt regardless of whether he has actual knowledge that he is being sought by the police." *Id.* Thus, the argument goes, the Commonwealth did not have to show that the defendant knew the purpose of the test about to be performed or the possible consequences of rubbing his hands through his hair. The difficulty of this position is that if the defendant did not know the purpose of the swabbing or the effect that rubbing his hand through his hair might have, then his act could not, in fact, indicate a consciousness of guilt. In contrast, the act of leaving the scene of a crime, whether or not one knows the police are in pursuit, itself tends to show a consciousness of guilt.

[10]The defendant also claims that the act of rubbing his hand through his hair was "testimonial" evidence, and thus, its admission violated his right against self-incrimination, guaranteed by art. 12. This claim is without merit. This is not a case similar to *Commonwealth* v. *Lydon*, 413 Mass. 309 (1992), where evidence concerning the defendant's refusal to have his hands swabbed was improperly admitted. *Id.* at 313-315.

[11]At the time, the defendant's case was still joined to the prosecutions of McQueeney, Kenney, Donna Barnoski, and Grace McLaughlin (Mc-

evidence, the judge permitted the Commonwealth to amend the bill of particulars by changing the words "acting in a joint criminal enterprise" to "acting individually and or [in a] Joint criminal enterprise." Defense counsel did not object to the amendment.

The defendant argues that this amendment allowed the Commonwealth to proceed against the defendant on a new theory. The amendment did not add anything new to the case and certainly did not prejudice the defendant. Defense counsel knew long before trial that the Commonwealth's evidence was that the defendant was the one who shot the victims: he was not "surprised" or "unable to present an adequate defense," due to the amendment. *Commonwealth* v. *Tavares*, 385 Mass. 140, 157, cert. denied, 457 U.S. 1137 (1982).

5. *Evidence of joint venture.* The defendant argues that, because the Commonwealth ultimately did not proceed on the theory of joint venture, the judge erred in admitting certain evidence that tended to show a joint venture. We review the contested evidence.

Peter was allowed to testify that, before the defendant shot him, McQueeney had pointed the gun at him and said: "Die motherfucker." Defense counsel did not object.[12] The defendant argues that admission of this statement "reveals [McQueeney's] mental state, specifically, his intent to kill Peter McDermott," and that, because the judge did not instruct the jury to disregard all evidence of his companions' statements and states of mind, the jury were free to infer that the

_____

Queeney's girl friend). Thereafter, the judge allowed the defendant's motion to sever.

[12]There was no objection when Peter was first asked about McQueeney's statement on direct examination. Later, in a series of questions eliciting testimony that none of the defendant's companions spoke during the moments leading to the shooting (the prosecutor asked Peter the same question with regard to each of the defendant's companions), defense counsel did object to the question "With regard to Michael McQueeney, what if anything did he say?," after which Peter repeated McSweeney's statement. Given that the statement had already been admitted without objection, see *Commonwealth* v. *Keevan*, 400 Mass. 557, 562 (1987), and that the evidence was merely cumulative, we perceive no prejudice.

defendant shared the same mental state as McQueeney. There is no substantial likelihood of a miscarriage of justice.

Even if McQueeney's statement showed an intent to kill Peter which a jury could have imputed to the defendant, the defendant's subsequent act of shooting Peter twice, more than supported an independent determination that he personally had the requisite intent. The defendant cites *Commonwealth* v *Podlaski*, 377 Mass. 339, 347 (1979), for the proposition that "[t]o be guilty on a joint venture theory, a defendant must share the intent of the principal." What the defendant apparently forgets is that *he was* the principal, according to the Commonwealth's case. Any error did not prejudice the defendant.[13] [14]

6. *Required finding of not guilty.* The defendant moved for a required finding of not guilty on the murder indictment, arguing that, because Peter did not actually see the defendant shoot Jack, and McQueeney could have taken the gun from the defendant, the Commonwealth's failure to prove joint venture entitles him to a finding of not guilty. We disagree. There was ample evidence from which the jury could have found that the defendant shot Jack. Moments after the defendant shot Peter, Peter heard his father say, "No, Billy, please don't. Nó. No." He heard the defendant say, "Relax,

---

[13]Given this conclusion, we do not consider the Commonwealth's argument that the statement was admissible "to give the jury the benefit of the complete occurrence." P.J. Liacos, Massachusetts Evidence § 8.16 (6th ed. 1994).

[14]The defendant also identifies Peter's testimony that his father's response ("Billy, we can't have this. Please, stop it") to McQueeney's statement, the defendant's reply ("Relax, Jack. He's only a kid"), his own explanation of why he lay quiet on the floor after being shot ("I knew Billy and his people were in my house, and they would have killed me") and Michael Cawley's testimony that Kenney was covering his face with a sweatshirt after exiting the victims' house were improperly admitted evidence of a joint venture. No objections were made to any of this testimony, and no motion to strike any evidence was made when the judge announced that, at the defendant's request, he would not instruct the jury on joint venture. There is no likelihood of a miscarriage of justice. The contested evidence was either admissible for other purposes (Jack's excited utterance, admissions by the defendant, Peter's state of mind), or, in any case, did not prejudice the defendant.

Jack, they're only blanks." He saw the defendant shoot again, and then heard another shot.

This is not a case like *Commonwealth* v. *Salemme*, 395 Mass. 594 (1985), where ten minutes elapsed between the shooting and the time the defendant was in the position from where the shooting occurred. See *id.* at 599-600. In that case, "there were two persons . . . with apparently equal opportunity to commit the murder." *Id.* at 601. We cannot say the same in this case. "[I]t is not necessary to show that it was not in the power of any other person than the defendant to commit the crime[s]." *Id.*, quoting *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965). Given that the evidence showed that the defendant shot Peter twice, and moments later Jack was shot, the jury were warranted in finding, beyond a reasonable doubt, that the defendant was the shooter.

7. *Ineffective assistance of counsel.* The defendant claims that trial counsel was ineffective for three reasons: (1) failing to move to strike the entire jury venire; (2) failing to object to the prosecutor's cross-examination of the defendant regarding his failure to report the crime; and (3) failing to move to strike evidence tending to show that McQueeney, Kenney, and Donna Barnoski were involved in a joint venture to kill the McDermotts. We have discussed each of these issues above, and in each case, concluded that there was no error, or if there was, the defendant was not prejudiced thereby.

Because no substantial risk of a miscarriage of justice arose from the errors alleged, the defendant may "not prevail by asserting as to the same issue[s] the ineffectiveness of his counsel." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). In any case, we think it likely that counsel's restraint was tactical and that objection may well have been futile. Trial counsel's performance did not "[fall] measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).[15]

---

[15]The defendant argues that he was entitled to an evidentiary hearing, in relation to his motion for a new trial, on the issues of the ineffectiveness of

8. *Review under G. L. c. 278, § 33E.* The defendant urges us to exercise our power under § 33E to order a new trial or reduce the verdict of murder in the first degree because the evidence generates a "profound doubt" as to his guilt. We agree with the Commonwealth that a profound doubt is hardly generated when the jury heard and credited evidence that the defendant shot two men each twice in the head at point-blank range.

The defendant further argues that, even if none of the eleven other issues raised in his brief (as he identifies and enumerates them) is sufficiently prejudicial to require reversal, the combination of errors creates a substantial likelihood of a miscarriage of justice. We cannot agree. We see no prejudice resulting from any of the alleged errors.

The defendant's convictions for murder in the first degree, assault by means of a dangerous weapon, and armed assault with intent to murder, and the trial judge's denial of the motion for a new trial are all affirmed.

*So ordered.*

---

his counsel and the hardship colloquies which the judge conducted. He further argues that, because the judge's excusal of jury pool members out of the parties' presence amounted to knowledge from "extrajudicial origin" which impaired the judge's impartiality, the judge was required to recuse himself. These arguments are without merit.