## Commonwealth *vs.* Latasha Crawford.

Suffolk. November 3, 1998. - February 25, 1999.

Present: Wilkins, C.J., Lynch, Fried, Marshall, & Ireland, JJ.

*Homicide. Battered Woman Syndrome. Intoxication. Constitutional Law,* Admissions and confessions. *Evidence,* Admissions and confessions, Expert opinion. *Practice, Criminal,* Admissions and confessions, Voluntariness of confession, Bill of particulars.

In the circumstances of a murder case, the judge should not, at a hearing on a motion to suppress the defendant's statement to police, or at trial, have refused to allow the defendant's expert psychologist to testify regarding the defendant's condition as a battered woman, as bearing on the voluntariness of her confession: where the inculpatory statement was the only evidence against her, the error was prejudicial and a new trial was required. [64-68]

Discussion of cases considering whether a variance between a theory set forth by the Commonwealth in a bill of particulars and the theory on which the prosecution seeks to prove its case at trial prejudices a defendant. [68-70]

Indictment found and returned in the Superior Court Department on September 9, 1991.

The case was tried before *James D. McDaniel, Jr.,* J., and a motion for a new trial was heard by him.

*Charles W. Rankin* for the defendant.

*Paul B. Linn,* Assistant District Attorney, for the Commonwealth.

Marshall, J. In September, 1991, a Suffolk County grand jury returned an indictment charging the defendant, Latasha Crawford, with the murder of Nathaniel Mason Jones. In July, 1992, after hearing four hours of evidence, a jury convicted her of murder in the first degree on a theory of extreme atrocity or cruelty.[1] G. L. c. 265, § 1. Crawford was not the shooter of the

---

[1]The judge instructed the jury on murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, and on murder in the second degree. The jury rejected a verdict of murder in the first degree on a

victim: the Commonwealth proceeded against her as a joint venturer.[2]

Crawford claims error on multiple grounds. Among these are her claim that it was error for the trial judge to refuse to allow her to present expert testimony, both at a hearing on her motion to suppress and at trial, that a statement she gave after she was arrested and in response to questioning by the police was not voluntary because she was a battered woman traumatized by beatings by the victim, and was also suffering the effects of alcohol and drug use when she made the statement. Because her statement was the only inculpatory evidence against her, Crawford argues, the error was prejudicial.

We conclude that the judge should have permitted Crawford's expert to testify at the hearing on the motion to suppress. Moreover, the judge should not have barred that testimony at trial on the issue of the voluntariness of the defendant's statement. We reverse the conviction, and remand the case to the Superior Court for proceedings consistent with this opinion. In light of our decision, we need not address each of Crawford's arguments raised on appeal because they concern matters not likely to arise on retrial.[3] We comment, however, on Crawford's attack on the bill of particulars.

1. On July 19, 1991, Boston police responded to a report of shots being fired at 183 Magnolia Street in the Roxbury section

---

theory of deliberate premeditation. There was no instruction on manslaughter. In her motion for a new trial, Crawford claimed that her trial counsel's failure to present her case as one of manslaughter, and his failure to request a manslaughter instruction, was ineffective assistance of counsel. She makes the same argument before this court. Because of our disposition of the case, we do not address that claim.

[2]The grand jury also indicted, for the same crime, Errin Crawford (the defendant's brother), Steven Chaney, and Willie Stone, Jr. The defendant was the only one of the four against whom the Commonwealth proceeded to trial. In the summer of 1992, on the Commonwealth's motion, the indictments against the other three defendants were dismissed without prejudice. The Commonwealth explains that Shaun Jones, the only eyewitness who would have testified against them, had disappeared. Shaun Jones did not testify against Latasha Crawford.

[3]Crawford also challenges the prosecutor's closing argument, the judge's instructions to the jury on joint venture, the judge's decision to permit the jury to consider extreme atrocity or cruelty as a theory of murder where the Commonwealth's bill of particulars specified only that the manner of homicide was deliberate premeditation, and the prosecutor's use of peremptory challenges to exclude women (including three black women) from the jury. She also claims she received the ineffective assistance of trial counsel.

of Boston. The first officer on the scene was directed to the victim by Shaun Jones, in whose apartment the shooting took place.[4] The victim was still alive but unconscious.[5] He had wounds to his head and legs. At trial, the medical examiner testified that the victim died of a gunshot wound to the head — the only gunshot wound he identified.

Shaun Jones told the police that the victim had been shot by "several black males," and that, after the shooting, he had heard a female voice saying something like, "Come on, come on, let's go." Shaun Jones gave the police the name of the defendant as the victim's girl friend. Five days later the defendant was arrested. After receiving the Miranda warnings, she was questioned by the police.

In response, Crawford told the police[6] that she had known the victim for over two years, was in a relationship with him, and was pregnant with his child. During the course of their relationship he had assaulted her, the last time on the morning of the shooting.[7] She told police that at about 7 A.M. that morning, she had been driven by Steven Chaney, a long-time friend, to Shaun Jones's apartment. Nathaniel Jones arrived in a taxi at the same time.[8] Crawford told Chaney to drive away, but Nathaniel Jones chased the car, jumped on it, and, while assaulting Crawford, dragged her by her hair out of the car, into the building, and up the stairs into the third-floor apartment. There he dragged her into the bedroom, shut the door, and continued to assault her.

---

[4]The victim and Shaun Jones were not related. Shaun Jones did not testify. The evidence was introduced through the testimony of the police officers to whom Shaun Jones had spoken.

[5]The victim survived for approximately three weeks after the shooting.

[6]Detective Sergeant Charles M. Horsley of the Boston police department testified that he had made a tape recording of the defendant's statement. The tape recording was played to the judge at the voir dire and to the jury at trial and a transcript of the recording was entered in evidence.

[7]Crawford told Detective Horsley that the victim Jones had beaten her "five or six" times, maybe more. In support of her motion for a new trial, Crawford pointed to the failure of her trial counsel to call available witnesses to testify about the numerous and brutal beatings inflicted by Nathaniel Jones on the defendant. The defendant's expert psychologist opined at a voir dire that women who suffer from battered woman syndrome minimize the beatings they receive and that Crawford was "severely traumatized" as a result of progressive and "very severe domestic violence."

[8]Shaun Jones later told the police that, earlier on the morning of the shooting, he was smoking "crack" with the victim and the victim had said, "Where is the bitch?" meaning the defendant.

Alerted by Chaney to the assault on his sister, the defendant's brother, Errin Crawford, arrived at the apartment, interrupting the beating. He argued with the victim, and told his sister to leave with him. The defendant and her brother then drove with Chaney to Chaney's apartment, where Errin Crawford retrieved something from some bushes, which the defendant said was a gun.[9] Errin Crawford, Steve Chaney, the defendant, and Willie Stone, Jr., then walked back to Shaun Jones's apartment.[10] When they entered the apartment, the victim ran into the bedroom and hid in a closet. According to the defendant, she and her brother followed him into the bedroom, where Errin Crawford shot the victim. She told the police that she heard two or three shots fired, and that the victim was screaming. Errin Crawford, Stone, Chaney, the defendant, and Shaun Jones all ran out of the apartment. Crawford told Detective Horsley that her brother had shot the victim because he beat her "all the time"; her brother had seen the defendant's bruises from the victim's assault on her that morning and "got mad and did what he did."

2. Just prior to trial, a hearing was held on Crawford's motion to suppress the statements she had made in response to the police questioning. Detective Horsley testified that, when the defendant was arrested in mid-afternoon, she had to be awakened, appeared disheveled, but did not appear to be under the influence of drugs or alcohol. He testified that she had cried during the interview; the tape recording has many lengthy pauses when Crawford can be heard crying.

Crawford testified that, during her interrogation, she had vomited several times, and she had been feeling the effects of large amounts of alcohol she had consumed the night before and cocaine she had ingested over the previous four days. She testified that she was pressured into speaking to Detective Horsley and had been feeling "beaten up, torn down." She testified that, although earlier at the police station she had denied ever

---

[9]In response to police questioning, Crawford told the police that her brother had retrieved a gun from the bushes. She was not asked whether she learned this when the gun was retrieved, or later, when it was used by her brother to kill the victim. At the hearing on the motion to suppress, Crawford testified that she did not know that her brother had a gun until he shot the victim.

[10]Detective Horsley did not ask Crawford when Willie Stone, Jr., had joined the group.

receiving medical treatment for injuries she received from the victim, her statement was not true.[11] See note 7, *supra.*

Defense counsel then called an expert psychologist to testify on the defendant's state of mind as a victimized or battered woman. Crawford made a written and oral offer of proof in support of the admission of the expert opinion testimony on her "motion to suppress statements and at trial."[12] The judge refused to allow the expert to testify, stating that he did not need "any expert to help me determine whether or not she voluntarily, intelligently and knowingly waived any rights she might have had in the circumstances, and whether or not the statement was voluntary." The judge further stated that: "I don't think a jury needs [the expert testimony] either. That's something that an ordinary person can determine on all the evidence in this case. No expert is needed for that purpose." He denied the motion.

Crawford argues that it was error for the judge to refuse to consider the testimony of the expert psychologist at the hearing on the motion to suppress and to bar that testimony from the

---

[11]Photographs of Crawford's bruises were taken by the police and introduced in evidence at trial.

[12]In her written offer of proof that was directed to both the suppression hearing and the trial, Crawford argued that, as a battered woman with a history of drug and alcohol abuse, "[e]xpert knowledge regarding the victimized woman is directly relevant to defendant's state of mind and intent at the time of a killing, or the giving of statements . . . ." She argued that the condition of battered woman syndrome is outside the scope of the ordinary juror's experience, and that expert testimony on battered woman syndrome had been admitted by other courts and met the standard for admissibility described in *Frye* v. *United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), adopted by the Commonwealth in *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269 (1963). Defense counsel also told the judge: "[T]he argument would be advanced that this woman's free will was overborne by the police officers at the time of their questioning of her and that the reason that that free will was overborne was the course of her mental status at the time, the course of her history, her unique history, her involvement with the alleged victim, his relationship to her, the beatings she had taken, the alcohol and cocaine that she had consumed. And how those factors, her history, her mental state, alcoholism, her prior history of being beaten by this fellow, affected her voluntariness, affected her rational intellect, affected her free will.

"And on that score, the question of her voluntariness, any evidence, I submit, that would be probative of her mental condition, should be admissible in the court, both at a trial level, mental condition before and after the alleged crime, and also mental condition before and at the time of the making of the statement."

jury's consideration of the voluntariness of her statement. In the circumstances of this case, and based on the proffer of the defendant, the judge should have admitted the testimony of Crawford's expert witness. Our "humane practice" requires that at a preliminary hearing in the absence of the jury, a judge must decide whether a defendant's incriminating statements were voluntary. *Commonwealth* v. *Tavares*, 385 Mass. 140, 149, cert. denied, 457 U.S. 1137 (1982). Moreover, "[d]ue process requires the Commonwealth to persuade the judge at the suppression hearing that the statement was voluntary before it is admitted in evidence at trial." *Id.* at 151, citing *Jackson* v. *Denno*, 378 U.S. 368, 376 (1964), and *Commonwealth* v. *Harris*, 371 Mass. 462, 471 n.3 (1976). A trial judge, therefore, has a "constitutional obligation to conduct a voir dire examination in the absence of the jury where the voluntariness of a confession is in issue and to make an affirmative finding of voluntariness before the jury are allowed to consider it." *Commonwealth* v. *Tavares*, *supra* at 151, quoting *Commonwealth* v. *Harris*, *supra* at 469.

At a suppression hearing, there is an initial presumption that the defendant's statement is voluntary, placing the burden on the defendant to produce evidence tending to show otherwise. See *Commonwealth* v. *Harris*, *supra* at 471 n.3. Where, as here, that evidence is forthcoming, the presumption disappears and the Commonwealth must then prove beyond a reasonable doubt that the statement was voluntary. *Commonwealth* v. *Tavares*, *supra* at 152. If evidence proffered by the defendant is not admitted, the burden of proof does not shift.

The testimony of experts may provide invaluable help to judges and to juries in making a determination of voluntariness. See, e.g., *Commonwealth* v. *Chung*, 378 Mass. 451, 458 n.8 (1979) (judge had independent obligation to instruct jury to consider voluntariness of confession in light of extensive psychiatric evidence of involuntariness); *Commonwealth* v. *Banuchi*, 335 Mass. 649, 654-656 (1957) (prejudicial error to exclude expert testimony on effect of sudden deprivation of alcohol or mental capacity of confirmed alcoholic to make alleged confessions). See also *Commonwealth* v. *Hunter*, 416 Mass. 831, 832-833 (1994) (reversal required where defendant offered expert psychiatric testimony on voluntariness and judge denied motion for voir dire); *United States* v. *Gordon*, 638 F. Supp. 1120 (W.D. La. 1986), aff'd, 812 F.2d 965 (5th Cir.), cert.

denied, 438 U.S. 1009 (1987) (battered woman syndrome expert evidence admissible in suppression hearing on voluntariness of statements of defendant accused of joint venture murder of abusive husband). In making his assessment, a judge may not simply rely on his own generalized knowledge of alcoholism, substance abuse, battered woman syndrome, or other debilitating conditions, but must make a determination whether a particular statement made by a particular defendant under a particular set of circumstances was voluntary.

In this case, the defendant proffered expert testimony to explain her particular mental state as a battered woman who had been traumatized by the brutal assaults of the victim, by witnessing the shooting of the victim, and by her own alcohol and drug dependency, when she was questioned by the police. She testified that she had been pressured by the police to answer their questions. She also sought to demonstrate, through her expert, that she was incapable of refusing to answer questions put to her by the police. The defendant was entitled to place this evidence before the judge, as the Commonwealth was entitled to cross-examine the expert and test the strength of the proffered testimony. Of course, a defendant who suffers from one or more debilitating conditions may nevertheless be found to have made a statement that is voluntary. See, e.g., *Commonwealth* v. *Libran*, 405 Mass. 634, 638-639 (1989) (mentally retarded, schizophrenic, manic depressive defendant capable of making voluntary statement); *Commonwealth* v. *Allen*, 395 Mass. 448, 456-457 (1985) (statement voluntary even though given while defendant recovered from gunshot wound implicating areas of brain controlling "appropriate" behavior). That is no reason to exclude the expert testimony.

When relevant expert testimony is entirely excluded by a trial judge, any resulting ruling is suspect. *Commonwealth* v. *Banuchi, supra* at 654-656.[13] We do not agree with the Commonwealth that the trial judge's prior exposure to the general subject of posttraumatic stress disorder or battered woman

---

[13]"As a general rule the question whether an expert is qualified and the propriety of questions put to such expert are for the determination of the judge in his sound discretion. . . . However, the matter is not one solely of reviewing the judge's exercise of discretion, when the judge wholly excludes expert testimony because of serious misunderstanding of the issues of fact upon which such expert testimony is offered or because of failure to perceive the relevance of the offered testimony." (Citations omitted.) *Commonwealth* v. *Banuchi*, 335 Mass. 649, 655 (1957).

syndrome is determinative of whether he should have permitted expert testimony on those subjects. It could be that the expert's testimony would not have altered his ruling. But he should have heard the evidence before he made his ruling.

We comment further on the judge's statement that there was no need for the jury to consider the expert testimony on the voluntariness issue.[14] We do not agree with the judge's conclusions that the effects of posttraumatic stress disorder, or battered woman syndrome, are within the common experience of the ordinary juror.[15] A judge, of course, has "no duty to ask the jury

[14]As noted earlier, see note 12, *supra*, and the accompanying text, at the hearing on the motion to suppress, the judge stated that the jury did not need to hear the expert testimony, and denied the defendant's motion to admit it at trial. Immediately before the trial began, the judge conducted a voir dire of the expert witness to determine whether the defendant could refer to the expert's testimony in her opening statement. The focus of this voir dire of the expert was on Crawford's mental state at the time of the *shooting*: the judge questioned the expert on her opinion regarding Crawford's "criminal responsib[ility]," while defense counsel argued that he was entitled to present evidence probative of Crawford's mental condition "before and after, during, the alleged commission of a crime." The expert testified that Crawford was a battered woman so severely abused that she had symptoms of posttraumatic stress disorder; she had been so severely beaten on the day of the shooting that Crawford was in fear for her life, believed that it was the victim's intention to kill her, and was unable to do anything of her own volition except to escape. Her testimony was directed to Crawford's mental state at the time of the shooting. Following the prosecutor's opening statement, the judge told defense counsel that he could refer to the expert witness in his opening statement. Counsel did not do so, and did not call the expert as a witness to testify on Crawford's mental state at the time of the shooting. The Commonwealth argues that the judge placed no restrictions on the scope of the expert's testimony, suggesting that the defendant could have called the expert to testify on the voluntariness of Crawford's statement. We disagree. As reflected in the docket, the judge already had ruled that the expert testimony could not be introduced at trial on that issue.

[15]See *Commonwealth* v. *Goetzendanner*, 42 Mass. App. Ct. 637, 642 (1997) ("pattern of behavioral and emotional characteristics common to the victims of battering lies beyond the ken of the ordinary juror and may properly be the subject of expert testimony"). The Legislature has concluded that battered woman syndrome evidence is of a kind appropriately presented to the fact finder by expert testimony. General Laws c. 233, § 23F, inserted by St. 1996, c. 450, § 248, which replaced G. L. c. 233, § 23E, repealed by St. 1996, c. 450, § 247, on the same subject, states that "[i]n the trial of criminal cases charging the use of force against another where the issue of defense of self or another, defense of duress or coercion, or accidental harm is asserted, a defendant shall be permitted to introduce . . . (*b*) evidence by expert testimony regarding the common pattern in abusive relationships; . . . the relevant facts

to pass on voluntariness unless it is made a live issue at trial." *Commonwealth* v. *Alicea,* 376 Mass. 506, 523 (1978). Here the voluntariness of the defendant's statement was a live issue before and during the trial, and the judge correctly gave a humane practice instruction to the jury. If a humane practice instruction was warranted, admission of evidence relevant to the jury's determination of voluntariness was also warranted.

The erroneous exclusion of the expert testimony both at the motion to suppress and at trial was prejudicial. Such an error may not be prejudicial where there is overwhelming evidence independent of the defendant's statement that the defendant committed the crime. *Commonwealth* v. *Vazquez,* 387 Mass. 96, 103 (1982); *Commonwealth* v. *Chung,* 378 Mass. 451, 459 (1979); *Commonwealth* v. *Johnston,* 373 Mass. 21, 25 (1977). This is a far cry from those cases. Moreover, Crawford's confession was the only evidence presented at trial directly tying the defendant to the crime. See *Commonwealth* v. *Hosey,* 368 Mass. 571, 579 (1975).

3. The Commonwealth's bill of particulars identified only a theory of premeditation to support the murder indictment. The defendant says that she was unfairly and prejudicially taken by surprise when, after both the prosecution and the defense had rested, the prosecutor requested (and received) a jury instruction on extreme atrocity or cruelty and then argued that theory in her closing statement. Given our disposition of the case, we comment briefly on this claim.

Crawford's defense was that she was an observer and not a joint venturer. We do not find persuasive the Commonwealth's argument that her defense could not have been prejudiced by the Commonwealth's pursuit of a conviction under a theory different from the one contained in the bill of particulars. A defendant in Crawford's circumstances could argue that she was merely an observer *and* that the murder was not of a caliber warranting a conviction under a theory of extreme atrocity or cruelty.

Because Crawford was not on notice that she faced prosecu-

and circumstances which form the basis for such opinion; and evidence whether the defendant displayed characteristics common to victims of abuse. Nothing in this section shall be interpreted to preclude the introduction of evidence or expert testimony . . . where such evidence or expert testimony is otherwise now admissible." See *Commonwealth* v. *Rodriquez,* 418 Mass. 1, 7 n.7 (1994); *Commonwealth* v. *Goetzendanner, supra* at 643.

tion for murder in the first degree on a theory of extreme atrocity or cruelty, she says, her counsel did not dwell on the medical evidence that was presented — evidence she claims negates any such theory. For example, the testimony of the medical examiner was that, based on the autopsy, the victim had been shot once. Crawford also points out, correctly, that the essential elements of the crime of murder in the first degree on a theory of deliberate premeditation differ from the essential elements of the same crime on a theory of extreme atrocity or cruelty. Had the judge instructed the jury on a theory of deliberate premeditation only, the jury would have been instructed on the first prong of malice only and would have to find that Crawford had a specific intent to kill the victim. *Commonwealth* v. *Judge*, 420 Mass. 433, 441 (1995).

"The purpose . . . of specifications in a bill of particulars . . . is to give a defendant reasonable knowledge of the nature and character of the crime charged . . . and the effect, when filed, is to bind and restrict the Commonwealth as to the scope of the indictment and to the proof to be offered in support of it." *Rogan* v. *Commonwealth*, 415 Mass. 376, 378 (1993), quoting *Commonwealth* v. *Hare*, 361 Mass. 263, 267-268 (1972). In *Commonwealth* v. *Tavares*, 385 Mass. 140 (1982), the defendant argued, as here, that he was prejudiced by the variance between a bill of particulars giving deliberate premeditation as the Commonwealth's theory, and the presentation of the case to the jury on a theory of extreme atrocity or cruelty. *Id.* at 157. We concluded that in the circumstances of that case the variance between the particulars and the proof offered at trial did not prejudice that defendant who, charged with viciously beating a man to death, was on notice prior to trial that the Commonwealth might introduce in evidence photographs and the autopsy report of the victim. In this case, there was little evidence comparable to the kind of which the defendant in *Tavares* had notice.

In *Commonwealth* v. *Edelin*, 371 Mass. 497 (1976), we held that the defendant was entitled to an acquittal because of a prejudicial variance between the indictment as particularized and as proved at trial.[16] We noted that it was open to the Commonwealth "within reasonable limits of circumstance and time" to amend its bill. *Id.* at 521, citing G. L. c. 277, § 40 (since

---

[16]See G. L. c. 277, § 35: "A defendant shall not be acquitted on the ground of variance between the allegations and proof if the essential elements of the crime are correctly stated, unless he is thereby prejudiced in his defence. . . ."

repealed). Such amendments have been permitted after the evidence has closed, *Commonwealth* v. *Barnoski*, 418 Mass. 523, 539 (1994); *Commonwealth* v. *Corcoran*, 348 Mass. 437, 441-442 (1965), or even after final arguments, *Commonwealth* v. *Lussier*, 333 Mass. 83, 91-92 (1955). Here too, it was open to the Commonwealth to amend its bill. It did not do so. Because of our disposition of the case, however, we need not consider whether Crawford was prejudiced because she did not have "reasonable knowledge of the crimes charged, with adequate notice to prepare [her] defense," *Commonwealth* v. *Amirault*, 404 Mass. 221, 233-234 (1989). At her new trial, if the Commonwealth proceeds on a claim of murder in the first degree,[17] the defendant will now be on notice that the Commonwealth may proceed on a theory of extreme atrocity or cruelty.[18]

The judgment is reversed, the verdict set aside, and the case is remanded to the Superior Court for a new trial consistent with this opinion.

*So ordered.*

---

[17]At oral argument counsel for the Commonwealth informed us that he was "authorized to tell this Court that if this Court were to find sufficient evidence of extreme atrocity or cruelty, but decided to vacate that verdict under its [§] 33E powers, the Commonwealth would not elect to retry this case for first degree murder, and would accept a reduction of the verdict to second degree murder."

[18]Because of the jury verdict rejecting murder in the first degree on the theory of deliberate premeditation, the principles of double jeopardy preclude the Commonwealth from proceeding against Crawford on that theory. G. L. c. 263, § 7 ("person shall not be held to answer on a second indictment or complaint for a crime of which he has been acquitted upon the facts and merits"). See *Luk* v. *Commonwealth*, 421 Mass. 415, 419 (1995), citing *North Carolina* v. *Pearce*, 395 U.S. 711, 717 (1969). See also *Huffington* v. *State*, 302 Md. 184, 191 (1985), cert. denied, 478 U.S. 1023 (1986) (defendant, acquitted of premeditated murder, whose conviction of felony-murder on same underlying facts was reversed on appeal, could be retried for felony-murder but not for premeditated murder).