COMMONWEALTH *vs.* ANGELO BANUCHI
(and a companion case against the same defendant).

Suffolk.   December 3, 1956. — April 5, 1957.

Present: WILKINS, C.J., RONAN, WILLIAMS, COUNIHAN, & CUTTER, JJ.

*Evidence,* Relevancy and materiality; Of another crime; Opinion: expert; Judicial discretion; Admissions and confessions. *Error,* Whether error harmful. *Practice, Criminal,* Exceptions: whether error harmful. *Arrest. Constitutional Law,* Due process of law.

At the trial of indictments arising from the burning of a building, it was prejudicial error to admit, in cross-examination of the defendant, wholly irrelevant testimony concerning the defendant's possession of a large knife and his intention to use it in an assault on his divorced wife. [654]

Hypothetical questions asked by the defendant at a criminal trial of a qualified expert witness, based on facts in evidence, as to the mental condition of the defendant at a time about a year before the trial when he made alleged confessions after a prolonged period of heavy drinking followed by sudden deprivation of alcohol were erroneously excluded on the ground that the witness had not seen or examined the defendant before testifying. [654–656]

The mere fact that one arrested at about midnight of a Sunday was not brought into court until the following Wednesday morning did not, in the circumstances, invalidate for want of due process of law confessions obtained from him during the interval. [656–657]

THREE INDICTMENTS, found and returned on December 16, 1954.

The cases were tried in the Superior Court before *Dewing,* J.

*Thomas E. Dwyer,* (*George A. Brown* with him,) for the defendant.

*Francis J. Hickey,* Assistant District Attorney, (*Anthony J. Young,* Assistant District Attorney, with him,) for the Commonwealth.

COUNIHAN, J.   On December 16, 1954, the grand jury for Suffolk County returned three indictments against the de-

fendant, the first charging him with wilfully and maliciously setting fire to and causing to be burned a dwelling house; the second charging him with an assault with intent to murder one Gertrude Guarino; and the third charging him with the murder of one Paul Yee.

The defendant pleaded not guilty to each of these indictments and they were tried together before a jury on October 24, 1955. The trial was subject to G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended. The jury returned a verdict of guilty on the first indictment, a verdict of guilty of murder in the second degree on the third indictment, and a verdict of not guilty on the second indictment. Thereafter the judge imposed a sentence of life imprisonment on the third indictment and a sentence of eighteen to twenty years on the first indictment to be served concurrently with the sentence of life imprisonment.

The cases come here upon the defendant's appeals accompanied by thirteen assignments of error relating to exceptions taken at the trial, and a transcript of the evidence. G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended.

The evidence may be summarized as follows: On Sunday, October 24, 1954, at about 9 P.M. a fire occurred in a five story dwelling house numbered 10 Davis Street in the South End section of Boston. A separate family occupied each floor of this building. One Pasquale Guarino and his wife Gertrude lived on the second floor. The deceased Paul Yee, a child about three years old, lived with his parents and their four other children on the third floor. Paul Yee died as a result of smoke inhalation and burns sustained in the fire.

The defendant was friendly with Guarino and had lived with him and his wife for several weeks in the summer preceding the time of the fire. Guarino and his wife quarreled frequently and she left him four or five days before the fire and did not return until the morning of the day of the fire. During her absence the defendant spent most of his time with Guarino and they did considerable drinking. The defendant came to the Guarino apartment early Sunday

evening. Guarino and his wife were drunk when he got there and after the defendant joined them he consumed more than three quarts of wine. The defendant left them about 8:45 P.M.

Both Guarino and his wife were overcome by smoke and the fumes of the fire and were taken to the Boston City Hospital.

During the height of the fire the defendant was discovered climbing up a fire ladder and breaking a window on the second floor. He was removed by the firemen and sent to the city hospital for treatment of a cut hand. He refused treatment there and later he returned to the scene of the fire. He was recognized as the one who had earlier been seen climbing the ladder and he was arrested for interfering with the firemen.

As he was being booked at the police station shortly before midnight he was accused by Sergeant Murphy, a police officer, of having set the fire. He denied this and accused Guarino of having done it. He was then locked up on suspicion of having committed arson. About midnight he was taken by Sergeant Murphy and several other officers to the city hospital where he identified Guarino who was then semiconscious. Upon his return to the police station he was questioned in the guard room at about 1 A.M. Monday by the sergeant in the presence of some officers, one of whom took down on a typewriter the questions of the sergeant and the answers of the defendant. Thereafter the defendant signed this typewritten statement which included a statement that what he said was of his own free will and without duress. In this talk with the sergeant he said that Guarino wanted to get rid of his wife and that Guarino had tipped over a five gallon can of range oil near the stairs on the first floor and had thrown a lighted match into it.

On Monday at about 10 A.M. Lieutenant Monahan of the homicide division of the police department talked with the defendant at the station house in the presence of several policemen and firemen. One Burke, an official stenographer of the police department, took down the conversation. In

this talk the defendant said that what he told Sergeant Murphy about Guarino setting the fire was "phony," that he did not see Guarino set the fire, and that he only said that because he was tired and hungry.

At about 4:55 A.M. on Tuesday the defendant called in Lieutenant Enos who was then in charge of the station and told him that he wanted to talk about the case about which he was in trouble. As a result the lieutenant sent Sergeant Mullally in to talk with the defendant. He was accompanied by another sergeant. At that time the defendant told Sergeant Mullally that Guarino wanted to get rid of his wife so that he could go back to Italy where he had property. Guarino asked the defendant to set the fire and told him that when he got back to Italy he would send for him and give him some of his property. Guarino said that his wife was so drunk she would not be able to escape from the fire. Guarino then gave the defendant a five gallon can of range oil to put on the stairway. The defendant said that he took the oil, went down to the first floor and at the foot of the stairs he turned the can over and let the oil run out. He soaked his handkerchief in oil, lighted it and dropped it into the oil on the floor and the fire started. Subsequently the sergeant took the defendant to the guard room upstairs and called in two patrolmen one of whom, O'Neil, took down in longhand the interrogation of the defendant which the sergeant conducted. Later O'Neil transcribed his longhand notes on a typewriter and the defendant after reading the typewritten statement signed it. This statement was substantially the same as that which he had given Sergeant Mullally in the cell block. He added that he and Guarino had been discussing the plan the week previous when he and Guarino had been drinking excessively.

On Tuesday at about 9:30 A.M. Lieutenant Monahan again talked with the defendant at the station house and Burke took stenographic notes of the conversation. The defendant verified the statement which he had made to Sergeant Mullally earlier that morning. He added many details and said that he made the earlier statements because

he did not want to "hold the bag." At the conclusion of this interview Lieutenant Monahan took the defendant to the city hospital where he confronted Guarino and repeated his story. Guarino denied all of his accusations.

In the meantime one Dr. Lappin, a physician who was customarily called in to attend prisoners at this station house, saw the defendant on Sunday at 11:50 P.M. to attend to his hand. The defendant refused treatment. He saw him again on Tuesday at 1:40 P.M. at the police station and made a tentative diagnosis of delirium tremens. The defendant was nervous and restless. The doctor again saw the defendant at 6:55 P.M. when he appeared to be in about the same condition. The doctor said that upon neither examination was the defendant actually suffering from delirium tremens. Between the visits of the doctor on Tuesday the defendant had been pulling the bars of his cell, and he ripped a toilet bowl off its lugs and broke it. Shortly after the doctor last saw the defendant, Lieutenant Enos committed the defendant to the city prison where he was put in a padded cell. He was brought into the Boston Municipal Court on Wednesday morning.

Testimony relating to the alleged confessions of the defendant and the circumstances attending them was given at a voir dire hearing before the judge in the absence of the jury. The judge ruled that these confessions were proper to be received and considered by the jury. *Commonwealth* v. *Valcourt*, 333 Mass. 706. Thereupon substantially the same testimony was given before the jury.

Because of what shall hereinafter appear certain contentions of the defendant, upon which some of the assignments of error are based, must be sustained and there must be a new trial. Therefore we do not consider all of the assignments of error because they concern matters not likely to arise at such new trial.

The fifth and sixth assignments of error are based upon exceptions to the exclusion of certain questions put to Dr. Lappin on the voir dire by counsel for the defendant. The excluded questions were not accompanied by an offer of

proof.    Therefore we do not consider them.    Moreover, most if not all of the excluded testimony was admitted by the judge when Dr. Lappin later testified before the jury when he was called as a witness for the defendant.

We are, however, concerned with the ninth assignment of error which was based upon exceptions to the admission of certain testimony in the cross-examination of the defendant by the district attorney regarding the possession of a large knife by the defendant and of his intention to use it in per-petrating an assault upon his divorced wife.    This was palpable error.    In the direct case of the Commonwealth the judge over the objections and exceptions of the defend-ant permitted evidence to be introduced relative to the possession of this knife by the defendant.    At the conclu-sion of the case for the Commonwealth the judge directed the jury to disregard all such evidence; later in the cross-examination of the defendant he permitted the introduction of similar evidence in even a more emphatic form by associ-ating the possession of the knife by the defendant with an intent to use it in an assault upon his divorced wife.    Such evidence had nothing to do with the crimes with which the defendant was charged.    Its effect might be to inflame the minds of the jury.    It is plain that evidence of other crimes of which the defendant might be guilty was not admissible. "Fairness to a defendant in a criminal case requires the rule that the commission by him of an independent crime cannot ordinarily be shown as evidence tending to show the commission of the crime charged. . . .    Moreover, it is not fair that a defendant in the course of a trial should be called upon to defend himself against accusations not set forth in the indictment."    *Commonwealth* v. *Stone,* 321 Mass. 471, 473.    *Commonwealth* v. *Ellis,* 321 Mass. 669, 670.    *Common-wealth* v. *Valcourt,* 333 Mass. 706.

We are of opinion that there was error in the exclusion of the hypothetical questions which the defendant sought to put to Dr. Thimann, a witness called by him.    The defend-ant made an offer of proof in which he stated that the questions were predicated on evidence already in the case

regarding the defendant's mental state and that he expected that the witness would testify that the defendant was hallucinatory and was not in a healthy mental state and did not know what he was saying when he made his alleged confessions. See *Commonwealth* v. *Russ,* 232 Mass. 58, 73.

As a general rule the question whether an expert is qualified and the propriety of questions put to such expert are for the determination of the judge in his sound discretion. *Campbell* v. *Shea,* 332 Mass. 422, 425. *Boston Gas Co.* v. *Assessors of Boston,* 334 Mass. 549, 573. However, the matter is not one solely of reviewing the judge's exercise of discretion, when the judge wholly excludes expert testimony because of serious misunderstanding of the issues of fact upon which such expert testimony is offered or because of failure to perceive the relevance of the offered testimony. *Muskeget Island Club* v. *Nantucket,* 185 Mass. 303. *Old Silver Beach Corp.* v. *Falmouth,* 266 Mass. 224. *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authority, ante,* 189, 198. See *Muzi* v. *Commonwealth, ante,* 101, 106. These decisions all appear applicable to a situation like that in the instant case where the judge excluded expert testimony of a witness seemingly well qualified in the field of the psychiatric aspects of alcoholism from which it could have been found the defendant was suffering at the time he made the alleged confessions.

The proffered testimony was excluded apparently because the expert witness had not seen or examined the defendant before the witness took the stand. This was more than a year after the time when the alleged confessions were made so that an examination just before trial would be of little value. The reason given by the judge for the exclusion of these questions overlooked the purpose of such testimony. The hypothetical questions to be asked were to be based upon facts which were in evidence. On this state of facts and upon his knowledge gained from his education, training and general experience, the expert opinion of the doctor was to be sought on the general capacity of the defendant for truthful and accurate statement, and on the mental condi-

tion and responsibility of a person of the type of the defendant who had been steadily drinking for many days before he made the alleged confessions.

The doctor's opinion as to the effect of a sudden deprivation of alcohol on the mental capacity of a confirmed alcoholic was also sought. Such testimony as to the general effect on such a person of a prolonged drinking spree followed by sudden deprivation of alcohol, from an expert like Dr. Thimann, could be reasonably helpful to the jury in appraising the mental condition of the defendant at the time of his alleged confessions. The opinion of the doctor was of a type which the defendant was entitled to offer through a qualified expert and it was prejudicial error to exclude it.

The seventh assignment of error relates to the defendant's exceptions to the admission of the alleged confessions. The defendant argues that these confessions were void, because involuntary, in view of the period of detention of the defendant after arrest and before he was brought into court. The defendant was arrested at about midnight of Sunday, October 24, 1954, and he was not brought into court until Wednesday morning, a period of about two days and nine hours. Our law clearly requires that a defendant be brought into court as soon as reasonably possible after arrest. *Tubbs* v. *Tukey,* 3 Cush. 438. *Keefe* v. *Hart,* 213 Mass. 476. We do not consider the delay in bringing this defendant into court to have been unreasonable.

Doubtless, the contention was advanced in behalf of the defendant in the light of decisions of the Supreme Court of the United States of which *McNabb* v. *United States,* 318 U. S. 332, and *Upshaw* v. *United States,* 335 U. S. 410, are examples. These cases related to Federal law enforcement and seem to hold that in trials in Federal courts undue delay in bringing a defendant into court renders void a confession obtained during the period of delay. No constitutional question of due process was considered in that line of cases.

Since the arguments before us in the case at bar the United States Supreme Court has handed down a decision

in *Fikes* v. *Alabama*, 352 U. S. 191, in which the question of due process was considered. In a six to three decision it was held that a confession obtained during a period of delay of over a week in bringing a defendant into court rendered such a confession void because of want of due process. There were, however, in that case circumstances which prompted the majority of the court to say "The totality of the circumstances that preceded the confessions . . . goes beyond the allowable limits."

We think the *Fikes* case wholly distinguishable from the case at bar. The period of delay here was not unduly long and there were no periods of prolonged questioning. His confessions appear to have been freely given. His mental and physical condition, because of his excessive drinking, may well have been such that he could not have been brought into court Monday, and on Tuesday he was in the process of recording the confession he had made early that morning. He had made charges at first against Guarino which required investigation, as likewise did discrepancies in the various stories he told. In any event, so far as this record shows, the delay does not appear to have contributed materially or improperly to the confessions. There was no denial of due process which rendered the confessions void.

It may be important to note that the defendant testified in his own behalf and in both direct and cross-examination admitted the essential details of his confessions.

Because of what we have said, at least two of the contentions of the defendant upon which assignments of error were predicated must be sustained and there must be a new trial.

*Verdicts set aside.*
*Judgments reversed.*