## COMMONWEALTH *vs.* WILLIAM BUTLER.

Suffolk. May 7, 1996. - August 14, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, GREANEY, & FRIED, JJ.

*Arrest. Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Arraignment, Delay in commencement of prosecution. *Due Process of Law,* Delay in commencement of prosecution.

Discussion of the rule of prompt presentment stated in Mass. R. Crim. P. 7 (a) (1), and earlier and more recent case law considering the same. [523-524]

Discussion of the focus of inquiry in cases of delayed presentment of a criminal defendant occurring before the decision of *Commonwealth* v. *Rosario,* 422 Mass. 48 (1996). [524-525]

The statements of a defendant, who was lawfully arrested for breaking and entering early on a Friday morning and held past the hour before which he could have been arraigned on Friday on that felony and over the weekend, during which period, beginning late on Friday morning and concluding at about 3 P.M., and again on Saturday, the defendant voluntarily and knowingly waived his Miranda rights and made incriminating statements with respect to a murder, were not, in the circumstances, required to be suppressed as taken in violation of Mass. R. Crim. P. 7 (a) (1), as the delay in presentment in the circumstances was not unreasonable. [525-526] LIACOS, C.J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on June 18, 1993.

A pretrial motion to suppress evidence was heard by *Constance M. Sweeney,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *O'Connor,* J., in the Supreme Judicial Court for the county of Suffolk and the appeal was reported by him.

*Jane Davidson Montori,* Assistant District Attorney, for the Commonwealth.

*Kevin G. Murphy* for the defendant.

FRIED, J. We consider whether the defendant's incriminating statements regarding the homicide with which he is

charged should be suppressed. After his arrest for breaking and entering, the police delayed his presentment to a court until after questioning that led to his statements concerning the homicide.

The defendant is charged with murder in the first degree and breaking and entering in the nighttime. Prior to trial, the defendant moved to suppress statements he made to the West Springfield police after his arrest and prior to his presentment to a court for arraignment. Following a hearing, a Superior Court judge granted the defendant's motion to suppress the statements. The Commonwealth sought leave to obtain interlocutory review of this ruling from a single justice of this court pursuant to G. L. c. 278, § 28E (1994 ed.), and Mass. R. Crim. P. 15 (b) (2), 378 Mass. 882 (1979). The single justice allowed the Commonwealth's application and transmitted the case to the full court. We now vacate the allowance of the motion to suppress.

## I

The judge made the following findings of fact.[1] On June 5, 1993, the victim's mother reported to the West Springfield police department that the victim had been missing since May 23, 1993. On June 9, 1993, the victim's brother and Robert Lunt, the owner of the multi-family residential unit where the victim resided, went to the police station to report that the defendant had broken into the victim's apartment on June 7, 1993. Lunt also reported that the defendant was the last person to see the victim before her disappearance. Lunt registered with the police a breaking and entering complaint against the defendant.

At approximately 11 P.M. on Thursday, June 10, 1993, the police received a call that alerted them to a vehicle parked outside the victim's residence. A check of the registration plate revealed that the plate was stolen. The police entered the building and discovered two individuals upstairs and Lunt

---

[1]We adopt the findings of the Superior Court judge. The facts we recite that do not appear in the Superior Court judge's memorandum are set out, based on uncontradicted testimony, in order to complete the sequence of events in this case. They do not affect the legal conclusions of this opinion.

in the basement.[2] A further search of the basement uncovered the victim's body hidden under a pile of carpeting. The police brought Lunt and the two others to police headquarters for questioning. By 12:20 A.M., the police located and arrested the defendant on charges of breaking and entering in the nighttime based on Lunt's earlier complaint.

Captain Murray, the lead investigating officer, remained at the apartment house until approximately 5 A.M. A preliminary examination of the body by Captain Murray and the medical examiner revealed a core body temperature of sixty-one degrees while the room temperature was seventy-two degrees. The body showed no visible signs of trauma and had not begun to decay or decompose.

Upon his return to the station, Captain Murray reviewed the statements made by Lunt and the other two persons found at the scene. At 5:40 A.M., Captain Murray and State Trooper John Murphy began interviewing Lunt. Lunt made two statements that indicated that the defendant knew the victim's whereabouts during the period that she was missing. After more than three and one-half hours of questioning Lunt, the officers were unable to draw any further conclusions regarding the cause of the victim's death.[3]

At approximately 10:50 A.M. on Friday, June 11, 1993, Captain Murray and Trooper Murphy began to interview the defendant at the West Springfield police department, where he was in custody.[4] The officers again informed the defendant that he was under arrest for the June 7, 1993, breaking and entering of the victim's apartment. The officers advised the defendant of his Miranda rights, Miranda v. Arizona, 384 U.S. 436 (1966), and the defendant waived those rights both orally and in writing. The officers testified that they gave the defendant an opportunity to make a telephone call. The judge

[2]Although the Superior Court judge found that all three persons were found in the basement, the uncontradicted testimony of Captain Daniel J. Murray, the officer in charge of the investigation, reveals that the two of the persons were initially discovered in the kitchen on the first floor.

[3]The Superior Court judge made no findings as to the matters in this paragraph.

[4]The defendant's booking sheet seems to indicate that when the defendant was booked on the breaking and entering charge, a bail order in the amount of $25 was issued. When the defendant was arrested for murder, the "$25.00" was scratched out and the words "No Bail per Singer" were written.

made no findings to this effect. When informed about the victim's death, the defendant said that he knew nothing about it and had last seen the victim approximately two weeks before.

At one point, the defendant denied telling Lunt about the victim's supposed whereabouts during the time when she was reported missing. Captain Murray brought Lunt into the room. The defendant and Lunt began accusing each other of lying. One of the officers told the defendant that the autopsy would probably indicate the cause of death. Lunt then yelled at the defendant to tell the officers what happened. The defendant screamed back, "I didn't mean to do it." The officers then removed Lunt from the room. It was approximately 1 P.M.

Earlier, at approximately 12:15 P.M., during the interview of the defendant, Captain Murray had called the Springfield District Court, which is located no more than a ten-minute drive from the police station. Captain Murray informed someone at the clerk's office that he had the defendant under arrest on a charge of breaking and entering and that he was interviewing him as a "possible suspect in a death from an unknown cause." The captain asked how late he could bring the defendant in for arraignment on the breaking and entering charge. The court employee responded that if he was not in the courthouse by 1 P.M., then he would not be arraigned that day. (Arraignments would next be held after the weekend, on Monday morning.)[5] Captain Murray knew that the defendant had a right to be arraigned, but he chose to continue the interrogation of the defendant rather than bring him to court for arraignment on the breaking and entering charge.

After Lunt left the interrogation room, the defendant started to cry. The officers gave the defendant a soda. The officers resumed questioning the defendant concerning his interaction with the victim. Shortly thereafter, at approximately 1:15 P.M. on Friday, June 11, 1993, the defendant agreed to provide a written statement. In that statement, the defendant asserted that in the early morning hours of May 27, 1993, he and the victim were smoking crack cocaine at her apartment when she convulsed, vomited, and soon

[5]There is no justification for this practice in light of Mass. R. Crim. P. 7 (a) (1), as amended, 397 Mass. 1226 (1986).

thereafter lost consciousness. The defendant claimed that he tried unsuccessfully to resuscitate her. He then cleaned her with paper towels and decided to move her body to the basement. He stated that in order to keep vomit from falling out of her mouth while he transported her to the basement, he stuffed paper towels in her mouth. He then reported that he preserved her body by packing "blue ice" around it. There was testimony that the statement was completed at 2:15 P.M., but the judge made no findings to that effect.

The officers doubted the defendant's version of events which conflicted with the statements of several other witnesses. Moreover, the condition of the body was not consistent with preservation merely by ice packs. A State trooper called the West Springfield police department to report that the medical examiner, while conducting the autopsy of the victim's body had discovered paper towels lodged deep in her throat. This statement indicated to the officers that suffocation was the cause of death.

At approximately 3 P.M., the officers presented this information to the defendant and told him that they did not believe his "blue ice" story. The defendant then acknowledged that he had preserved the victim's body by placing it in the freezer of an ice cream truck. Lunt owned the truck and the victim had sold ice cream from it prior to her death. After the victim's death and before the officers discovered her body, the defendant had driven the truck in the victim's place serving ice cream from it while the victim's body was in the truck's freezer. At approximately 3:15 P.M. on Friday, June 11, 1993, the defendant was charged with murder in the first degree.

On Saturday, June 12, 1993, some time after 11 A.M., Captain Murray interviewed the defendant again. The defendant made essentially the same inculpatory statements he had made at the three o'clock interview on Friday. At some point, the defendant became agitated and demanded to be returned to his cell. Captain Murray stopped the questioning and returned the defendant to his cell. At approximately 1 P.M., the defendant requested to speak with Trooper Murphy alone. Trooper Murphy met with the defendant alone. Trooper Murphy suggested that someone must have assisted the defendant when he moved the body out of the ice cream truck's freezer to the basement. The defendant responded that the trooper was correct, "but I'm not gonna to tell you who he is until I

talk to my lawyer on Monday." Trooper Murphy immediately ended the interview.

There was testimony that on Sunday, June 13, 1993, the defendant asked to speak with Captain Murray. Captain Murray went back to the cell area. The defendant told Captain Murray, "I could help you find Steven Higgins." Captain Murray would not talk with the defendant. The judge made no findings concerning the defendant's interaction with the officers on Sunday.[6]

The Superior Court judge found that, except for the last conversation with Trooper Murphy on Saturday, before each of the defendant's statements, Captain Murray advised the defendant of his Miranda rights both orally and in writing. On each of those occasions, the defendant acknowledged, both in writing and orally, that he understood his rights and waived them. The defendant was not under the influence of drugs or alcohol at any time during the questioning. The defendant's responses to the questions were detailed and responsive. Finally, the judge found that, although the questioning was not genteel, it was civil and the officers did not engage in deception or trickery.

On Monday, June 14, 1993, the defendant was presented to the Springfield District Court and arraigned on both the breaking and entering and murder charges.

The defendant moved to suppress all of his statements given to the police after his arrest and before his presentation to the court on June 14, 1993. The judge granted the defendant's motion to suppress all of the statements. The judge found that the delay between the defendant's arrest and presentation to a court was unreasonable under the test outlined in *Commonwealth* v. *Sylvia*, 380 Mass. 180, 183-184 (1980), citing *Commonwealth* v. *Fielding*, 371 Mass. 97, 114 (1976). The judge reasoned that "[t]he delay was unreasonable because Captain Murray knew that the defendant was entitled to a prompt arraignment but 'deliberately' delayed it with 'a purpose to the procuring of a statement' from the defendant. See *Fielding*, 371 Mass. at 114. . . . In these circumstances, suppression of the defendant's statements serves the precise purpose of deterring the police from future malfeasance."

---

[6]We note that all questioning had commenced the day before.

## II

Rule 7 (a) (1) of the Massachusetts Rules of Criminal Procedure, as amended, 397 Mass. 1226 (1986), states that "[a] defendant who has been arrested shall be brought before a court if then in session, and if not, at its next session." When the defendant is presented to the court, rule 7 requires the court to determine whether the defendant is indigent and, if eligible, to assign counsel to the defendant. In addition, at presentment the court must either arraign the defendant or set a time for arraignment,[7] and determine the conditions of the defendant's release. Therefore, the rule of prompt presentment is designed to facilitate the defendant's right to counsel, provide the defendant with a recitation of the charges against him by a member of the judiciary, and ensure that the defendant's detention is not unlawful. See *Commonwealth* v. *Cote*, 386 Mass. 354, 361 n.11 (1982). In a less direct manner, the rule, recognizing the coercive nature of a lengthy interrogation, provides the court with an additional assurance (over and above the assurance supplied by compliance with the requirements of *Miranda, supra*) that statements made by the defendant after arrest but before presentment are free, intelligent, and voluntary. See *Commonwealth* v. *Rosario*, 422 Mass. 48, 51 (1996) (purpose of rule is to "eliminate the opportunity and incentive for application of improper police pressure"); *Commonwealth* v. *Banuchi*, 335 Mass. 649, 656-657 (1957).

Our early case law required police to present the defendant to the court as soon as reasonably possible. See *Keefe* v. *Hart*, 213 Mass. 476, 482 (1913); *Tubbs* v. *Tukey*, 3 Cush. 438, 440 (1849). More recent cases have struck the balance between effective law enforcement and the defendant's rights by allowing delay, so long as the delay is not unreasonable. See *Rosario, supra* at 52 (summarizing case law). Whether or not the delay was unreasonable was determined on a case-by-case basis. See, e.g., *id*. at 57-58 (more than twenty-hour delay upheld); *Commonwealth* v. *Fryar*, 414 Mass. 732, 743 (1993) (confession "after the hour when overnight arrestees are usually taken to the District Court for arraignment" not excluded for unreasonable delay); *Banuchi, supra* (arrest on Sunday,

---

[7]"Arraignment shall consist of the reading of the charges to the defendant and the entry of the defendant's plea to those charges." Mass. R. Crim. P. 7 (d), 378 Mass. 855 (1979).

arraignment on Wednesday not an unreasonable delay). The factors we have suggested that a judge consider when determining if a delay is unreasonable are: "(1) whether Miranda warnings were given; (2) the circumstances, including the passage of time between the illegal arrest and the confession; and (3) the purpose and flagrancy of the official misconduct." *Rosario, supra* at 52, citing *Commonwealth* v. *Sylvia, supra* at 183-184. Time alone is not a dispositive factor, but one of the factors in a flexible, totality of the circumstances analysis. In fact, we stated in *Rosario, supra,* that "[w]e are not aware of any reported Massachusetts opinion in which a statement was suppressed because of unreasonable delay in arraigning a defendant."

Earlier this term, after the decision of the Superior Court judge in this case, this court decided *Commonwealth* v. *Ortiz,* 422 Mass. 64 (1996), at the same time as *Commonwealth* v. *Rosario,* 422 Mass. 48 (1996). Recognizing that the police, trial judges, prosecutors and defense counsel are entitled to as clear a rule as possible in this area, "[w]e adopt[ed] for the future, with respect to police questioning of an arrested person, a rule . . . [that] [a]n otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest (day or night), or if (at any time) the defendant made an informed and voluntary written or recorded waiver of his right to be arraigned without unreasonable delay." *Rosario, supra* at 56. Thus, the court created a "safe harbor" for statements, otherwise admissible, that the defendant provides within six hours of arrest. The court also explained that an effect of the rule will be to "bar admission of a statement made after the six-hour period unless there is a waiver of prompt arraignment." *Id.* Thus, in *Rosario* the court announced a per se rule that statements made during the six-hour safe harbor will not be excluded for unreasonable delay and that statements made after the expiration of the six-hour safe harbor will be excluded.

The court limited the application of the rule announced in *Rosario* to incidents of presentment delay occurring after our decision in that case was announced. See *id.* Therefore, the court did not apply the six-hour rule in *Rosario* and to apply it to this case would be to treat Rosario differently from the defendant here for no legitimate reason. Our decision in *Ortiz*

is not to the contrary. In that case, we noted that the defendant's statement was given within the six-hour period, implying that we certainly would not apply a more stringent rule retroactively than we established prospectively in *Rosario*. *Rosario* does, however, have a bearing on cases of delayed presentment that occurred before that decision. When we consider such cases, we no longer have to be concerned with the impact of the decision on police behavior. See *Rosario, supra* at 58. Defendants such as Rosario and the defendant here are thus unable to argue for suppression as a deterrent to future police conduct.

In this transitional class of cases, the focus of the suppression inquiry must be, as it was in *Rosario, supra* at 57-58, on how delay in presentment bears on the issue whether the defendant's statements were made freely, intelligently, and voluntarily. At some point the delay is so egregious as to put this aspect of a defendant's statements in doubt. And if the police have engaged in misconduct, other than delay, that would justify suppression as a deterrent against similar future conduct, that too will serve as a basis for suppression. See *id.* at 58. Cf. *Commonwealth* v. *Perito*, 417 Mass. 674, 681-682 (1994) (impact of egregious misconduct by police when considering dismissal of charges); *Commonwealth* v. *Fielding*, 371 Mass. 97, 114 (1976) (impact of misconduct by police when considering violation of Fourth Amendment to the United States Constitution).

The facts of *Rosario* are similar to those here. Both defendants waived their Miranda rights,[8] and the police did not coerce or threaten either defendant. See *Rosario, supra* at 57. An initially unlawful detention was not involved in *Rosario*, see *id.* at 57, nor is it an issue here, as the police held the defendant pursuant to a breaking and entering complaint and may have arranged for bail on his arrest. See note 2, *supra*. In both cases, the Superior Court judges' ground for suppression was that the officers deliberately delayed presentment to give them the opportunity to obtain statements. See *Rosario, supra*

---

[8]The delay did not infringe the defendant's right to counsel. The officers repeatedly advised the defendant of his right to counsel, which he waived both orally and in writing. Once the defendant mentioned counsel, all discussions were terminated, even when the defendant requested to speak with Captain Murray. See *Commonwealth* v. *Cote*, 386 Mass. 354, 360 & n.9 (1982).

at 50-51. See also *Ortiz, supra* at 66. We rejected that as a sufficient basis for suppression.[9] See *id.* at 53.

Finally, this is not one of those exceptional cases (of which our jurisprudence offers no examples) of such outrageously long delay that suppression is required simply as an expression of our disapproval. The delay in *Rosario* from the arrest to the completion of Rosario's confession, more than twenty hours, was longer than the delay from the arrest of the defendant here, at approximately 12:20 A.M., to his Friday statements, completed by 3:15 P.M. The defendant's Saturday statements were essentially identical to his Friday statements, perhaps reinforcing the conclusion that his Friday statements were voluntary.

If the facts had revealed that the delay, deliberate or not, had coerced or intimidated the defendant such that the voluntariness of the statements is placed in doubt, the result may have been different. But here there is no suggestion that the delay in any way tainted the otherwise free, intelligent and voluntary statements of the defendant. As in *Rosario,* the delay in arraignment here was not so unreasonable as to require the suppression of the defendant's voluntary statements given after he had received Miranda warnings.[10]

The order of the Superior Court allowing the defendant's motion to suppress is vacated. An order shall be entered in

[9]We recognized in *Commonwealth* v. *Rosario,* 422 Mass. 48, 53 (1996), that "[a]ny delay for the purpose of interrogation during a time when the appropriate court is in session involves a deliberate decision to delay arraignment in the sense in which the motion judge ruled in this case." And, further, the very holding of *Rosario, supra* at 56, assumes that a deliberate delay of presentment for the purpose of procuring a statement is not itself fatal. The fact that in this case the officer called the District Court rather than rely on his memory is not relevant to the inquiry of unreasonable delay.

[10]We agree with the dissent's strictures against appellate factfinding, but do not believe we have violated them. As we point out at the relevant passages, the matters we add are based on uncontroverted testimony and in no way contradict the motion judge's findings. They merely fill out the narrative. It would be a pity if appellate courts, which carefully study a record, were precluded from ever adverting to such matters, so long as they do so candidly and do not give them inappropriate significance. But most importantly, this disagreement is wholly irrelevant to our conclusion, which rests squarely on our decision in *Rosario, supra,* from which the Chief Justice also dissented. There, as here, the court agreed that the violation of the prompt presentment rule was deliberate, but the period of delay between Butler's initial and crucial statement on Friday afternoon and the

the Superior Court denying the defendant's motion to suppress.

*So ordered.*

LIACOS, C.J. (dissenting). The court today reverses the suppression order of an experienced Superior Court judge. While the court is correct in noting that *Commonwealth* v. *Rosario,* 422 Mass. 48 (1996), plainly created a prospective rule, the court goes further and does not apply the pre-*Rosario* rule to this pre-*Rosario* case. Indeed, in *Rosario* we faced this exact situation, announced a new rule, and applied our old law. Yet the court disregards that precedent, as well as engaging in appellate factfinding, so as to avoid the Superior Court judge's finding of deliberate, premeditated police misconduct.

The court says that the focus in this "transitional" case should be only on the reliability of the confession, i.e., the presentment delay's effect on voluntariness. *Ante* at 525. The critical step for the court's logic is the contention that in the wake of our newly fashioned bright-line safe harbor rule, there is absolutely no deterrent value in enforcing the old rule — a rule that in the most plain language possible required prompt presentment at the current session of court (or next session if court was closed).

Certainly, it is a narrow view of ordinary police behavior to think that there is no deterrent value in enforcing an old rule once a stricter rule is in place. In this case a senior police official, presumably familiar with the rule of law, called the courthouse to determine the latest time available to make presentment. He was in charge of the investigation. Once that police officer learned the hours of court, he intentionally decided not to bring the defendant to court for presentment, knowing not only that the defendant had already been in custody for over twelve hours, well past the usual hour that overnight arrestees are brought to court, but also that by reason of police delay no presentment could occur that day. There is certainly significant deterrent value in instructing police that they may not flagrantly disregard the clear dictate of Mass. R. Crim. P. 7 (a) (1), as amended, 397 Mass. 1226

time of his arrest was shorter than in *Rosario.* We note that Butler's statement was reaffirmed the next day.

(1986), that "[a] defendant who has been arrested shall be brought before a court if then in session, and if not, at its next session."

The court claims that it is faithful to the approach we took in *Rosario.* To support this claim, the court relies on a single sentence fragment from that case, which states, "With a new rule concerning questioning before arraignment now in place, we see no reason to apply an exclusionary rule . . . ." *Rosario, supra* at 58. Such a reading ignores the remainder of that sentence ("no reason to apply an exclusionary rule *in this case* for the purpose of discouraging future improper questioning prior to arraignment" [emphasis added]). *Id.* Second, and more importantly, this reading of *Rosario* ignores the paragraph in which the above-quoted sentence is found, a paragraph in which the court expressly asked whether deterrence concerns would justify suppression. *Id.* Our analysis did not find deterrence to be an inappropriate concern, but rather concluded that the facts of Rosario's case were not so different from our earlier decision in *Commonwealth* v. *Fryar,* 414 Mass. 732 (1993). Now the court would depart from that sound judicial approach, setting aside deterrence consideration altogether.[1]

*Rosario* is ignored in another way. In a brief footnote it is said that the result of that earlier case "assumes that a deliberate delay of presentment for the purpose of procuring a statement is not itself fatal." *Ante* at 526 n.9. That is not the holding of *Rosario,* where we fashioned a prospective rule that requires suppression of statements made after *any* six-hour delay, "deliberate" (in the sense of delay to obtain a statement, see *Rosario, supra* at 53) or not.[2]

Also supposedly justifying the result in this case is *Commonwealth* v. *Ortiz,* 422 Mass. 64 (1996), decided along with *Rosario.* In *Ortiz* we refused to suppress statements made within the six-hour safe harbor although that prospective rule

---

[1]I entirely agree that law enforcement personnel should be able to rely on statutes, rules of court, and case law. I only disagree, as discussed in my dissent in *Commonwealth* v. *Rosario,* 422 Mass. 48, 62-63 (1996) (Liacos, C.J., dissenting), when we go beyond allowing police to rely reasonably on the rule, but also deny remedy when the police stretch and test the outer boundaries of the judicial gloss.

[2]The delay must result neither from natural disaster or emergency nor result from the arrestee's own conduct such as intoxication. See *Rosario, supra* at 56-57.

was not yet in effect. See *Ortiz, supra* at 68. See also *id.* at 70 (Liacos, C.J., concurring in part). I agree with the court's statement that, "we certainly would not apply a more stringent rule retroactively than we established prospectively." *Ante* at 525. It makes no sense to send inconsistent signals, giving remedy when the past police conduct would now be acceptable. There is no deterrent value, only confusion, in such messages, and so we took that course in *Ortiz. Ortiz,* however, provides no shelter for what the court is doing here.

The situation we now face presents the precise opposite of the *Ortiz* facts. On the present facts, the police conduct certainly would require suppression under the new rule of *Rosario* and might require suppression under the old rule. Suppression, even based solely on the old rule, still sends a consistent message of deterrence, albeit a slightly "broader" deterrent message that police ought not openly flout a fundamental, century-and-one-half-old rule of criminal procedure. See *Tubbs* v. *Tukey,* 3 Cush. 438, 440 (1849). In the final analysis, only slight of hand allows the court to decide that, although we made a decision in *Rosario* generally to toughen the standards for prompt presentment,[3] we can apply a watered-down version of prior law to "transition" cases such as this one.

It remains to evaluate, under pre-*Rosario* standards, the police behavior in this case. The court correctly notes that we have not yet suppressed evidence because of delay in presentment alone. I suspect that this fact is a result of the clarity of even the pre-*Rosario* rule — demanding rapid presentment — rather than our approval of a host of delays. We have traditionally looked to "(1) whether Miranda warnings were given; (2) the circumstances, including the passage of time between the illegal arrest and the confession; and (3) the purpose and flagrancy of the official misconduct." *Rosario, supra* at 52, citing *Commonwealth* v. *Sylvia,* 380 Mass. 180, 183-184 (1980).

Admittedly, Miranda warnings were given here. Fortu-

---

[3]One way to view *Commonwealth* v. *Ortiz,* 422 Mass. 64 (1996), is to see it as involving the relatively rare case in which the new *Rosario* rule actually works in favor of the police. Under prior law, in some cases suppression might have been appropriate even with less than a six-hour presentment delay. The combination of a balancing of interests with a bright-line approach creates a rule that in some situations works in favor of the police and in some situations in favor of the arrestee.

itously, Butler began to make incriminating statements shortly after the police made their deliberate decision to delay presentment for three more days. Thus, the time between the arrest and some of the inculpatory statements is slightly shorter than in *Rosario*.[4] Nevertheless, calculating by hours of delay is deceiving and ignores our prior methodology. In *Rosario* the arrest came so late in the day that presentment could not be made. The only delay caused by police was in holding the arrestee beyond the ordinary time to bring overnight arrestees to court, i.e., the same situation as in *Fryar, supra.* See *Rosario, supra* at 53, 58. In Butler's case the statement came not only after the normal presentment hour, but so late that presentment could not even be made the same day as other overnight arrestees.

Butler's statements were the direct product of continued interrogation after the police decision to delay. Contrast *Commonwealth* v. *Perito*, 417 Mass. 674, 683 (1994) (detention without bail and delayed arraignment attributed to erroneous court practice not police misconduct). Our prior case law recognized that prompt presentment and police interrogation must be balanced (*Rosario* continues that balance with a stricter rule). Balance does not mean prompt presentment must be sacrificed altogether. No reasonable law enforcement official, knowing what the police knew here, would have believed it proper to continue detaining Butler without presentment.

The court somehow believes that the presentment delay itself does not count at all, and neither do the other "circumstances." *Ante* at 524. The court gives lip service to the right question, whether "this is . . . one of those exceptional cases . . . of such outrageously long delay that suppression is required simply as an expression of our disapproval." *Ante* at 526. Yet after the new and seemingly separate question, one gets from the court's opinion only more of the voluntariness inquiry. The new question deserves at least a new analysis. This is another example, despite the pre-*Rosario* three-prong test, of making only one prong count in this case. As for the "circumstances" here, the court admits that the interrogation "was not genteel." *Ante* at 522. The police captain first called

---

[4]The court glosses over Butler's Saturday statements, which came approximately thirty-six hours into his detention.

the court, was told what to do, and then flagrantly ignored what he had been told.

By even the most conservative calculation, the longest delay (that ultimately produced incriminating statements) litigated in a reported case in this Commonwealth is fifty-seven hours from arrest to presentment. See *Commonwealth* v. *Banuchi*, 335 Mass. 649, 656 (1957) (crime occurred at 9 P.M. Sunday, presentment at about 9 A.M. Wednesday). In the case before us today the delay was eighty hours, a full day longer than *Banuchi*.[5] Furthermore, here the interrogation did not simply drag on.[6] The police made a conscious decision after twelve hours of detention to hold the defendant for at least sixty-eight additional hours.[7]

Finally, I take issue with what might charitably be labelled appellate factfinding. The court apparently does this to reach its conclusion by avoiding focus on the eighty-hour delay and the deliberate and premeditated violation of rule 7 (a) (1). In reciting the facts, the court painstakingly describes its own view of the unfolding investigation and the police interrogation of Butler, which notably did not result in an actual confession, but only produced (1) Butler's admission that he

---

[5]I note that several extenuating circumstances existed in *Commonwealth* v. *Banuchi*, 335 Mass. 649 (1957). The presentment issue was dictum, as the court ordered a new trial on other grounds. The court indicated that Banuchi was very likely intoxicated for a significant period of the delay. *Id.* at 653, 656. See and compare *Rosario, supra* at 56-57 (safe harbor tolled until arrestee becomes sober). Finally, in *Banuchi* the defendant testified, repeating at trial the inculpatory statements made to police. Thus, cumulative evidence would have rendered any error harmless.

[6]The result might be different if the criminal activity under investigation is complicated, such as a large conspiracy or white collar crime, and the confession itself consumes a great deal of time in the telling.

[7]The judge expressly found that the police were informed that no presentment would be possible unless the defendant were in the courthouse by 1 P.M., and that the police made a decision to miss that deadline. The police therefore knew that no presentment could occur until the next Monday, since it is common knowledge that our courts are not open weekends. See *Jenkins* v. *Chief Justice of the Dist. Court Dep't*, 416 Mass. 221, 225 (1993).

It appears that the police made presentment in the ordinary course on Monday morning. At the time they decided to delay presentment they knew that it would be a three-day delay. At the critical moment of decision, the police knew Butler had been in custody for over twelve hours and that he would not be presented for initial appearance until Monday morning, another sixty-eight hours. The intentional delay here is the most egregious one of record in this Commonwealth.

was present at the victim's death, (2) some other statements that might corroborate some independent evidence of foul play (rather than death from a drug overdose as Butler claims), and (3) a few statements that contradict independent evidence, thereby suggesting that Butler's version of events is fabricated. Only after that recitation of the evidence against Butler is it disclosed that the inculpatory statements came after the active police decision to continue the interrogation rather than make presentment. This is a case about deliberate, egregious delay during police interrogation. We should not mask the true course of the detention as set forth by the motion judge. The court itself admits at least four times that certain facts it "finds" are not in the findings of the motion judge.[8]

It is true that much of that description has to do with things other than the time delays. But that is because the court expends a great deal of effort "complet[ing] the sequence of events," *ante* at 518 n.1, trying to show all the correct efforts of the police and thereby mitigate the premeditated police misconduct. Yet, all we learn is that the police offered Butler one telephone call, provided Miranda warnings, and refrained from further questioning once Butler indicated a desire to speak to an attorney.[9] Even if all of that is true, it does not vitiate the fact that in advance of that "compliance" the police made a deliberate decision to hold Butler for a significant additional time before bringing him to court. The motion judge understood this, for her lengthy and considered memorandum and order is tightly focused on the presentment issue. The question before us is whether there was a delay in presentment that warrants suppression. Appellate factfinding is always a troublesome practice. Here the court has used

---

[8]In several additional places the court simply notes that there is evidence or testimony that indicates certain facts. Of course, the motion judge, after hearing the witnesses first hand, reached the opposite conclusion from today's majority. While we have, on occasion, drawn implicit findings from a motion judge's memorandum of decision in order to uphold a judge's rulings, I am aware of no instance where we have done so, as here, to reverse such rulings. See *Bruno* v. *Bruno*, 384 Mass. 31, 35-36 (1981). Cf. *East Coast Steel Erectors, Inc.* v. *Ciolfi*, 417 Mass. 602, 603 n.2 (1994). See also *Matter of Jane A.*, 36 Mass. App. Ct. 236, 240 (1994).

[9]Approaching an appellate record in this way is, I humbly suggest, not appropriate for an appellate court of this stature.

that practice to relate immaterial facts that camouflage the real issue — what result should be had in the most egregious case of prejudicial presentment delay ever to be found in the Massachusetts Reports. I dissent.